## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :
:
    and :
:
*ex rel.*  PENGCHENG SI :
    9176 Barrick Street #304 :
    Fairfax, VA 22031 :
: **Case No.**
        Plaintiffs : **FILED UNDER SEAL**
: Pursuant to 31 U.S.C. § 3730
    vs. : (False Claims Act)
:
LAOGAI RESEARCH FOUNDATION, :
1109 M. Street, N.W. :
Washington, DC 20005 :
:
Serve: :
        Harry Hongda Wu :
        Resident Agent :
        1708 Broadfield Lane :
        Vienna, VA 22182 :
:
and :
:
CHINA INFORMATION CENTER, :
1109 M. Street, N.W. :
Washington, DC 20005 :
:
Serve: :
        Harry Hongda Wu :
        Resident Agent :
        1708 Broadfield Lane :
        Vienna, VA 22182 :
:
and :
:
**HARRY WU** :
1708 Broadfield Lane :
Vienna, VA 22182 :
:
and :
:
**CHINGLEE CHEN** :
1708 Broadfield Lane :
Vienna, VA 22182 :
:
Defendants :

Relator-Plaintiff Pencheng ("Simon") Si, by and through his attorneys, bring this False Claims Act ("FCA") Complaint, on behalf of himself and the United States of America, against Laogai Research Foundation ("LRF") and China Information Center ("CIC"), Virginia corporations (collectively "Corporate Defendants").  Defendant Harry Hongda Wu ("Mr. Wu") is an officer and/or owner of Defendants LRF and CIC and assisted in and conspired to commit the fraudulent activities, and Chinglee Chen is Mr. Wu's wife ("Ms. Chen") (collectively "Individual Defendants"), who also assisted in and conspired to commit the fraudulent activities.

## I.     NATURE OF THE CASE

1.      Relator-Plaintiff's case arises from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, including retaliation against him pursuant to 31 U.S.C. § 3730(h).  Relator-Plaintiff brings this action as a *qui tam* action for the United States Government, pursuant to 31 U.S.C. § 3730(b).

2.      Corporate Defendants, with the assistance of Defendants Wu and Chen, knowingly submitted, caused to be submitted or facilitated the submission of false and fraudulent documents to the federally funded China Democracy Programs ("CDP") administered by the National Endowment for Democracy ("NED"), which is in turn administered by the United States Department of State ("DOS").

3.      Additionally, Corporate Defendants, with the assistance of Defendants Wu and Chen, fraudulently submitted bills to the Government for what was alleged to be various CDP services when in fact such bills were actually for the personal use of Defendants Wu and Chen or their friends.

4.      Defendants also fraudulently induced the Government to execute contracts with Corporate Defendants by falsely stating and certifying through proposals and/or on the

contracts themselves that (1) the Corporate Defendants had certain key personnel working for the Corporate Defendants and/or such individuals were on their Board of Directors when these individuals were not performing such service nor in the positions asserted and/or (2) by inflating the qualifications of certain key personnel.

5.      During the relevant time period, Corporate Defendants participated in numerous multi-million dollar contracts from NED.

6.      In June of 2008, Relator was terminated from his employment with Corporate Defendants because he continually voiced complaints about Defendants' defrauding the Government.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732.

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732(a) because: (1) Corporate Defendants do business in the District of Columbia, (2) and/or many acts by Defendants proscribed by 31 U.S.C. § 3729 occurred in the District of Columbia.

## III.      PARTIES

9.      Relator, Pengcheng Si ("Simon Si" or "Relator"), is an adult resident of the Commonwealth of Virginia.   From May of 2003 through June of 2008, Relator worked for Corporate Defendants and Defendant Wu on the relevant DOS/NED Programs at issues herein.   During much of his time working with Corporate Defendants, Relator was the only computer technician at LRF and CIC.   Relator's responsibilities included providing tech support for all the hardware and software; testing computer equipment; training of other employees on the use of computer system; buying and shipping equipment.   In or about

November of 2004, Relator became the Assistant Director for Defendant CIC.   As such, Relator was privy to intimate details concerning the LRF program and CIC program as well as Defendants' false and fraudulent conduct, including reviewing accounting and billing information for the Corporate Defendants.

10.     Plaintiff, the United States of America, provides all funding for NED contracts with the Corporate Defendants and administers those contracts through the DOS.

11.     Defendant LRF is a publicly supported, non-profit corporation organized in Virginia with its principal place of business at 1109 M Street, N.W., Washington, D.C. 20005. LRF has entered into numerous contracts with agencies of the United States, primarily through the DOS/NED Program.

12.     Defendant CIC is a publicly supported, non-profit corporation organized in Virginia with its principal place of business at 1109 M Street, N.W., Washington, DC 20005. CIC has entered into numerous contracts with agencies of the United States, primarily through the DOS/NED Program. CIC is a wholly-controlled affiliate corporation by LRF.  Corporate Defendants operated from the same physical location at 1109 M Street, N.W., Washington, D.C.  Corporate Defendants shared office equipment, supplies, staff,  and jointly produced work.  The officers and directors of Corporate Defendants were substantially similar.

13.     Defendant Wu is the President and Executive Director of Defendant LRF and Publisher of Defendant CIC.  Defendant Wu headed both LRF and CIC since their inception. Defendant Wu is a signatory on LRF and CIC's proposals and on other documents relevant to DOS grants and various federal compliance.  Defendant Wu conspired with the other Defendants to fraudulently induce the Government to contract with the Corporate Defendants and assisted in the submitting of fraudulent information and billing to the Government of the United States of America.

14.     Defendant Chen is the wife of Defendant Wu.  Defendant Chen conspired with the other Defendants by assisting in the submission of fraudulent information and billing to the Government of the United States of America.

## IV.     BACKGROUND

**False Claims Act**

15.     The False Claims Act (FCA) provides that any person who causes a false claim to be submitted to the Government is liable for a civil penalty of between $5,500 and $11,000 per claim plus three times the amount of damages the Government sustained.  31 U.S.C. § 3729(a);  28 C.F.R. § 85.3.  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).  The act "require[s] no proof of specific intent to defraud" for a successful claim under the FCA.  *Id.*

**Federally Funded China Democracy Program ("CDP")**

16.     The NED was created by Congress in 1983 under the "The National Endowment for Democracy Act", Title V of Public Law 98-164.  "Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles . . .."  *DKT Int'l, Inc. v. United States Agency for Int'l Dev.*, 477 F.3d 758, 761 (D.C. Cir.  2007) (quoting *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)).  The NED's mission in part is "to encourage free and democratic institutions throughout the world through private sector initiatives, including activities which promote [] individual rights and freedoms" and to generally promote U.S. Democratic ideals abroad, among other goals.  22 U.S.C. § 4411, *National Endowment for Democracy Act*.  The NED is subject to legislative and executive branch oversight.  *See id.* at §§ 4412-15.

17.     In 1992, Defendant Wu submitted his grant application for NED funding for Defendant LRF supposedly to educate Chinese people about the Laogai system (hereinafter referred to as "LRF program").  Defendant LRF has received annual NED core support since 1992, which means federal money is provided to support all LRF's activities. *See Asia*, available at http://www.ned.org/grants/03programs/spotlight-asia.pdf, attached as Exhibit 1.

18.     Beginning in the fall of 1998, Congress took steps in the direction of a democracy program for China by passing legislation, in conjunction with the FY1999 appropriations process, authorizing DOS to set aside a portion of its "economic support funds" to provide assistance to "nongovernmental organizations located outside of the People's Republic China" for the purpose of "fostering democracy" in China.  *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Public Law No. 105-277.  Further, the legislation granting China permanent normal trade relations ("PNTR") in 2000 explicitly included a promise of additional funds to overseas Chinese democracy movements.  Since its fiscal 2001 Foreign Operations Bill, Congress has annually authorized the DOS to make funds available to U.S. based non-governmental organizations engaged in activities to "foster rule of law" in China.

19.     In 2002, Defendant CIC received funding from NED to promote an independent media outlet unaffected by Chinese government influences and to introduce Chinese people to democratic values of free press and free speech (hereinafter referred to as "CIC program").  See *Grants, 2004 Asia Programs*, available at http://www.ned.org/grants/04programs/grants-asia04.html, attached as Exhibit 2.  CIC is fully federally funded and grants are renewed annually.

20.     The grants received by Corporate Defendants were variations of the following contract number "Grant No. S-LMAQM-XX-GR-XXX" between the DOS and the NED,

which is hereinafter referred to as "DOS/NED Program".   These grants denoted "conflicts of interest" that were specifically prohibited.  For instance, directors, officers, employees and grantee's consultants were prohibited from using NED grant funding for purposes that are, or give the appearance of being motivated for private financial gain for themselves or  family members, or others with whom they have personal ties.  The grants also prohibited the use of NED-funded grantee property for personal reasons.

21.     Grant recipients also certified that no NED funds would be used for lobbying. This included certifying the funds could not be used to influence or attempting to influence any federal employee or members of Congress or their staff.  Should such action be taken, the grantee was required to file a "Standard Form LLL, 'Disclosure Form to Report Lobbying' in accordance with its instructions."   Specifically, the grantee noted that the lobbying certification was "a material representation of fact upon which reliance was placed when this transaction was made or entered into" and that failure to follow the lobbying requirements was a criminal violation of 31 U.S.C. §1352, *Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions*.

## V.     FACTS/FRAUDULENT ACTS

22.     Relator has personal knowledge, based upon review of corporate documents, and discussions with former and current employees of Corporate Defendants, including Defendant Wu that Defendant committed the following fraudulent acts.  From as early as 2001, Defendant Wu, together at various times with the other named defendants and other persons, engaged in a continuous scheme to defraud the Government through the submission of false claims for payment and false statements in support of claims for payments, to the extent of tens of millions of dollars.

23.     Relator is aware of Defendants' false and fraudulent conduct in the application and receipt of federal grants.  Relator's personal observations include: the falsification of documentation presented to the NED that (1) individuals, some of whom are Chinese dissidents, are directors and employees of LRF and CIC when those individuals were not in those positions, so as to obtain funding for Corporate Defendants; (2) that Defendant Wu spent 19 years of suffering in China's forced labor camps because of his political opinions when such information is not true; (3) the failure to comply with contractual and/or statutory lobbying; and (4) asserting that NED funds were used for the Corporate Defendants when instead funds were used for the personal use of Defendant Wu, his wife, Defendant Chen, their families and friends.

24.     Defendants' false claims, which were reviewed by Relator, were in the form of proposals, reports, correspondence, oral statements, and financial reports to DOS/NED Program, other federal agencies, and the Congress, as set forth below.  Each described act was knowingly committed by Defendants in an attempt to secure federal funds or was knowingly committed by Defendants in an attempt to retain federal funds already paid and to avoid disgorgement of those funds.

**USE OF FUNDS FOR LOBBYING**

25.     As noted above, the Corporate Defendants certified that no NED funds would be used for lobbying, which included certifying the federal funds would not be used to influence or attempt to influence any federal employee or members of Congress or their staff. *See* Grant Provision 18, Lobbying Prohibition and Disclosure, attached as Exhibit 3. Moreover, Corporate Defendants certified that they would file a "Standard Form LLL, 'Disclosure Form to Report Lobbying' in accordance with its instructions" should they not act in accordance with this requirement and their certification.  *Id.*  Specifically, the grantee noted

that the lobbying certification was "a material representation of fact upon which reliance was placed when this transaction was made or entered into" and that failure to follow the lobbying requirements was a criminal violation of 31 U.S.C. §1352, *Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions*.  *Id.*

26.     Relator found that millions of dollars of federal money was illegally used in violation of Corporate Defendants' "material" certifications and federal law.   Specifically, direct and grass roots lobbying of members of Congress and their staffs, as well as Executive Branch officials and their staff occurred and was not reported as lobbying as contractual and legally required.[1]  The "lobbying" at issue included, but was not limited to, agents and/or employees of the Corporate Defendants, including Defendants Wu and Chen, taking the following actions: (a) meeting in person with members of Congress and their staff and Executive branch officials and their staff, (b) corresponding with members of Congress and their staff and Executive branch officials and their federal staff, (c) encouraging members of the public to contact members of Congress and their staff and Executive branch officials and their staff to influence policy as well as funding for Corporate Defendants' programs, (d) hosting parties and other functions with members of Congress and their staff and Executive branch officials and their staff, and (e) using funds to advertise and post on websites, including Corporate Defendants' own websites, as well as producing paper materials for purposes of influencing the decisions of Congress and the Executive branch (collectively "lobbying actions").

27.     The aforementioned lobbying actions were taken to influence members of Congress and their staff and Executive branch officials and their staff with respect to (a) pending legislation and the introduction of legislation that directly and indirectly affected the

programs that funded the Corporate Defendants, (b) policy decisions by the Legislative and

Executive Branches with respect to programs directly and indirectly affecting the programs

that funded the Corporate Defendants, (c) policy decisions with respect to China's

interactions with the United States on a variety of issues, and (d) to influence members of

Congress and their staff and officers and employees of federal agencies with respect to other

policy and legislative decisions.

**Examples of Illegal Lobbying by Defendants**

28.     In May 2002, Defendants lobbied the offices of Senators Paul Wellstone, John

Kyl, and Tim Hutchinson to introduce a bill to the Appropriations Committee that would

increase Defendants' budget by $2,000,000.

29.     From February to May 2005, Defendants encouraged the offices of

Congresspersons Frank Wolf, Tom Lantos, and Nancy Pelosi to have Defendants' funding

increased.

30.     In 2006, Corporate Defendants requested the office of Congressman Frank

Wolf to contact NED to provide them with more funding.  In 2007, Corporate Defendants

requested from the offices of Congressmen Frank Wolf and Christopher Cox that Corporate

Defendants keep at least their current budget levels.

31.     From 2004 to 2008, Corporate Defendants annually provided financial support

to the campaign of Congress Frank Wolf, R-VA-10th District, who sat on the House

Appropriations Committee and was in charge the awarding of Defendants' contracts.  For

example, Corporate Defendants issued a check, number 1192, dated 7/11/2006, for the

campaign of Frank Wolf, in the amount of $500.  This was a direct violation of Grant

---

[1] Relator has no knowledge pertaining to whether members of Congress and the employees of the
Executive Branch and their staffs who were lobbied were aware of the prohibition on lobbying requirement for
Corporate Defendants but suspects that they were unaware of this requirement.

Provision 15(f).  Receipt for this funding when submitted to NED was labeled as "public

relations" to hide the lobbying activity that occurred.

      32.     From 2001 to 2006, Corporate Defendants lobbied for resolutions to promote

Corporate Defendants' policy and political agendas.  In fact, agents of Corporate Defendants

drafted resolutions and submitted them to members of Congress.  Agents of Corporate

Defendants also frequently communicated with State Department officials and members of

the Congress to seek endorsement of these resolutions.  Examples of these resolutions and

illegal lobbying activities include:

    a)  From September 2004 to November 2005, Corporate Defendants drafted resolutions and provided them to Congressman Frank Wolf, which became H.Res.294 to condemn the Laogai prison camps and was introduced by Representative Wolf on November 9, 2005.
    b)  In February of 2005, Defendants lobbied Senators Gordon Smith and Joseph Biden to sponsor S.Res.59, to urge the European Union to continue its arms export embargo of China.
    c)  In February and March of 2005, Defendants lobbied Secretary of State Condoleeza Rice to seek her endorsements for H.Res.294 and S.Res.59.

      33.     Corporate Defendants, on at least seven occasions in Washington, D.C. from

on or about January 25, 2002 through on or about May 4, 2006, hosted conferences and/or

receptions with members of Congress and their staffs for the purpose of discussing legislation

and/or resolutions related to policy concerns with China and/or funding for corporate

Defendants with federal funds from the NED program.  The following members of Congress

and their staff were targeted and/or attended these conferences/receptions:  Congresspersons

Christopher Cox, Dana Rohrabacher, Frank Wolf, Russ Feingold, Marcy Kaptur, Jon L. Kyl,

Patrick J. Leahy, Nancy Pelosi,  David Wu, Lynn Woosley, Christopher Smith, Tom Lantos,

Sam Brownback, and Tom Harkin.  Corporate Defendants then intentionally concealed their

use of federal money for lobbying purposes by falsifying documents, including meeting

agendas and narrative reports, to make it appear as if no lobbying activities were being conducted during the conferences.

34. Other illegal lobbying activity by Corporate Defendants and their agents, include:

a) From February to March 2004, Defendants lobbied Assistant Secretary of State, Lorne Craner, and other State Department officials such as Susan O'Sullivan seeking a U.S. resolution on the 60th annual Office of the United Nations High Commission on Human Rights ("UNCHR") meeting in Geneva. Corporate Defendants also approached the offices of Dana Rohrabacher, Frank Wolf, Christ Smith, Christopher Cox, and Mike Pence seeking endorsement of this resolution and sent petition letters to numerous governmental officials and other Congresspersons encouraging them to endorse such a resolution.

b) In February 2005, Defendants lobbied the office of Secretary of State Condoleeza Rice for a U.S. resolution for the 61st annual UNCHR meeting.

c) From December 2004 to April 2005, Corporate Defendants lobbied the office of Senator Hillary Clinton for her support in promoting Defendants' publication and encouraged her to chair a press conference in Congress to introduce Defendants' publications.

d) From April to June 2005, Corporate Defendants lobbied the Office of Congressman Bernie Sanders for a permanent normal trade relations ("PNTR") bill on China and a WTO bill.

e) In October 2005, Corporate Defendants lobbied Senator Hillary Clinton to draft a bill on issues of concern to Defendants about China.

f) In November 2005, Corporate Defendants lobbied numerous Congresspersons to seek their endorsement for a letter from Senator Clinton to President Bush urging the President to raise Defendants' concerns to Chinese officials.

35. From 2002 to 2004, Defendants lobbied to prevent congressional funding of the United Nations Population Fund ("UNFPA"), including meetings with the office of Congresswoman Nancy Pelosi to have her vote against a UNFPA refunding resolution.

36. From 2005 to 2008, Corporate Defendants lobbied the offices of members of Congress to sign joint letters for agendas that Corporate Defendants wanted implemented.

37.     Defendants, through misusing federal grants, sought to influence the election of the President and the Congress as well as appointment of government officials.  This included:

    a)  In December 2005, Defendants established a plan at their annual meeting to lobby candidates in the presidential election to support agendas.

    b)  In February 2009, Defendants sent a letter to Secretary Clinton objecting U.S. foreign policy towards China.

    c)  In February 2009, Defendants participated in a press conference and gave a speech criticizing President Obama and Secretary Clinton's foreign policy.

    d)  In February 2009, Defendants issued statements on their websites to urge the Administration to change its China policy.

    e)  In March 2009, Defendants sent a letter to President Obama asking him to reconsider his nomination of Charles Freeman as Chairman of the National Intelligence Council.

38.     Defendants' misuse of federal grants, in some instances, was so blatant that some of the abuses came to the attention of DOS/NED officials. For example, in August 2004, DOS/NED Program granting officials, while not knowing the extent to which Defendants had abused federal grant monies for lobbying, communicated with Defendants, highlighting to them that they should not lobby with federal funds. After this communication, Defendants simply continued to abuse the federal funding and use it for their illegal lobbying activities. Moreover, Defendants submitted a fraudulent report in August 2004 that appeared as if Defendants never engaged in lobbying and imputed their misconduct to a third party using their organizational affiliation without permission.  These misrepresentations were made with the intent to avoid any sort of repayment of federal funds already spent.

39.     Notably, after this warning, Corporate Defendants, with the assistance of the Individual Defendants, took steps to conceal their illegal lobbying.  Corporate Defendants' employees were specifically instructed to avoid reporting activities they took with respect to lobbying legislators and governmental officials.  Moreover, Corporate Defendants' reports

and communications with DOS/NED Program were fraudulently edited to show no lobbying activities were being conducted and no propaganda materials were distributed.

40.     Additionally, Defendants submitted false claims, for which they received significant monetary compensation, in order to hide costs associated with lobbying activities by Corporate Defendants and Defendant Wu.  Costs associated with lobbying are specifically prohibited under DOS/NED grant provision 3(j), *unallowable costs*.  These false claims used to falsely account for federal monies used for lobbying activities and obtain reimbursement for costs associated with these lobbying activities includes, but is not limited to submitting false claims for: (1) travel and per diem; (2) newspaper advertisement and internet advertisement; (3) staff time; (4) compensation for employees; (5) administrative, overhead, and other general expenses; (6) computers, other office equipment and supplies; (7) office space; (8) printing, mailing, and other distribution costs; and (9) e-mail accounts, websites, and other technology services.

## Use of Federal Funds for Personal Use for Individual Defendants, Their Families and Friends

41.     Corporate Defendants, per the direction of the Individual Defendants, charged expenses for individuals, including relatives and friends of the Individual Defendants, as employees who were never employed under DOS/NED programs nor performed any work for Corporate Defendants.  For example, Defendant Wu routinely had the Corporate Defendants compensate as "interns" personal friends such as Bernard Cleary (over $6,000.00) and Fengshi Yang even though they never performed any work for the company.  Moreover, Jinru Zhu, another friend of Defendant Wu, was paid as a full time employee for a period of months while performing no work for Corporate Defendants.  These individuals were billed as if they performed work on an DOS/NED program but they did not do so.  The following table lists some of the false payments reported to the DOS/NED Program:

| Payee | Check # | Date | Amt. | Reported to Gov. |
|---|---|---|---|---|
| Jie Yu (visitor visa) | Payroll | 03/20/04 | $2,000 | LRF employee |
| Jie Yu (visitor visa) | Payroll | 04/20/04 | $2,000 | LRF employee |
| Jie Yu & Yu's wife(visitor visa) | 1923 | 6/21/04 | $5,500 | Interns |
| Jie Yu (visitor visa) | 1158 | 11/12/04 | $1,000 | contract services |
| Jie Yu (visitor visa) | 2049 | 12/20/04 | $500 | Interns |
| Jie Yu (visitor visa) | 2207 | 09/02/05 | $4,600 | special meeting |
| Fengshi Yang | 2375 | 05/18/06 | $511 | Interns |
| Jie Yu (visitor visa) | 2628 | 09/11/07 | $2,400 | Inside China researcher |
| Jie Yu (visitor visa) | 2631 | 09/11/07 | $1,660 | Travel |

42.     Corporate Defendants also fraudulently reported to DOS/NED the salaries budgeted for certain employees to obtain additional funding.  This additional funding was not used to compensate the employees but instead was used by Defendants Wu and Chen for personal use.  For example, Defendant Wu faked a CIC office manager position, that was not in existence at that time (2005), to obtain additional DOS/NED program funding of approximately $40,000.00.  These overinflated monies were then used for his personal use and to pay an outstanding bill of over $17,000.00 to a third party publishing company, Kanzhongguo Association, Inc., for non-DOS/NED contract related work.

43.     In addition, in FY2006's budget, Corporate Defendants intentionally overstated the salary cost for the director of the D.C. office by approximately ten percent. Corporate Defendants also, for at least FY2005-2008, overstated the salary cost by approximately ten percent for the web-editor position.  At least portions of the monies

budgeted for these joint positions for both Corporate Defendants were then used for personal purchases and to purchase a digital camera for a friend.

44.     Defendants Wu and Chen also used DOS/NED funding for personal trips both domestic and abroad and to purchase items for their home, including a flat screen television and furniture.  Defendants Wu and Chen also purchased goods such as a portable DVD player for Wu's son, Harrison Wu, with federal funds designated for Defendant CIC.  Defendants Wu and Chen had the Corporate Defendants submit falsified documentation to DOS/NED to justify these personal expenses as business related such as by categorizing goods purchased for personal use as "office supplies".

45.     Throughout 2007 and 2008, Defendant Wu also used funds from DOS/NED programs to assist in his pursuit of a lawsuit against Yahoo! on behalf of individuals who resided in China, while simultaneously reporting to DOS/NED that the federal funds that Corporate Defendants were receiving were only spent on DOS/NED-related programs.  For instance, in an October 2007 report to NED, Corporate Defendants with the assistance of Defendant Wu, specifically fraudulently asserted that no federal money was used toward the lawsuit against Yahoo!

46.     The use of DOS/NED funds for purposes of supporting the lawsuit against Yahoo! included: (1) spending for domestic trips for Defendant Wu to assist these individuals in their lawsuit, (2) for the trips to the United States, and once in the United States for domestic trips, as well as living expenses, for the plaintiffs of the Yahoo! lawsuit, (3) for entertainment purposes for the plaintiffs in Atlantic City, New Jersey and Miami, Florida, and (4) to pay attorneys fees and costs associated with the lawsuit.  Federal monies was also used to support the Yahoo! lawsuit for translation services; compensation for employees; purchasing of computers and other office equipment and supplies; leasing of office space; and

printing, mailing, and other distribution costs.  Federal monies were even used as spending

money for the Yahoo! plaintiffs at casinos for gambling.

**Fraudulently Inducing the Government to Execute Contracts with Corporate Defendants By Inflating Key Personnel's Personal Histories/Qualifications and Listing Individuals In Key Positions That Did Not Hold Those Positions.**

47.     From as early as 2001, Corporate Defendants, at the direction of Defendant

Wu, submitted grant applications, proposals, and reports, that either inflated qualifications of

key personnel or listed certain individuals in positions that they never held at any time.  These

false statements occurred at least fifty times and were done to mislead DOS/NED into

contracting with Corporate Defendants.

48.     Defendant Wu has cultivated his reputation as being that of a political prisoner

in China.  However, Defendant Wu has provided false information about his "political

prisoner" status, not only to the public at large, but more importantly to DOS/NED.

Defendant Wu knowingly caused these misrepresentations to be made in Corporate

Defendant's applications, proposals, and reports to make Corporate Defendants successful

candidates for federal grants.  Upon information and belief, Defendant Wu's true reason for

spending time in prison in China was that he was convicted of non-political, criminal activity

and not because of any political stances.

49.     Specifically, Defendant Wu misrepresents that he was imprisoned in the laogai

prison for nineteen (19) years from 1960-1979 after making a statement as a university

student that the Soviet invasion of Hungary in October 1956 was a breach of international

law.  In fact, based upon statements Defendant Wu has made in a draft of his autobiography

and also publically, after serving a three year, non-imprisonment, penitentiary sentence for his

convictions from May of 1961 through May of 1964, Defendant Wu worked in China for

state-run factories.  Moreover, based upon statements Defendant Wu has made in a draft of

his autobiography and also publically, on or about January 22, 1970, Defendant Wu married a colleague and was provided a place to live by his then employer. All of these occurrences happened during his alleged nineteen (19) year prison stay (1960-1979).

50.    Upon information and belief, Defendant Wu has also fraudulently inflated his qualifications. For instance, as demonstrated by a 2007 affidavit submitted to the United States Department of Justice, Executive Office of Immigration Review, Office of the Immigration Judge in Chicago, Illinois, Defendant Wu falsely held out that when he "first came to the United States [he w]as a visiting professor of geology at the University of California, Berkeley". Upon information and belief, and as explained to Relator by Jingsheng Wei, who lived with Defendant Wu when he first came to the United States, in reality, Defendant Wu actually was working for California-based Chinese restaurants and auto repair shops. Additionally, Defendant Wu also told Relator that he was working at an auto shop and not as a professor at that time.

51.    Defendant Wu also has stated in his CV and relevant proposals that he had a longstanding affiliation with the Hoover Institution of Stanford University from 1991 to 2002. However, in a 2007 affidavit to an immigration court, Defendant Wu stated a much more limited relationship with the Hoover Institution for the time period between 1987-1991, meaning that he had not been affiliated with the Hoover Institute for some time. These misrepresentations have been made to DOS/NED in applications, proposals, and grants for federal funding.

52.    The Corporate Defendants have also submitted false statements with respect to the qualifications of Defendant Chen (Wu's wife) as an accountant while working for Defendant LRF. Defendant Chen has never been trained or certified in accounting, and she had little, if anything, to do with the actual work. By placing Defendant Chen in this

accounting position, Defendants were able to better hide the financial fraud as stated herein by procuring federal money from the DOS/NED Program which they knew or should have known they were not entitled to receive.

53.     In addition to the Individual Defendants, Defendants have submitted or caused to be submitted false information to DOS/NED regarding other personnel affiliated with the Corporate Defendants.  For example, Jinru Zhu, who had no background in computer technology, was reported in 2006 to DOS/NED as "Internet manager".  Ms. Zhu never assumed responsibility for that office.  Based on information and belief, Defendant Wu continued to secretly pay Zhu as a full-time employee after Zhu was fired in July 2008 by a director.

54.     In several instances, over different time periods, Defendant Wu, Lili Yang, Kuide Chen, Yuan Gu, Tienchi Liao, Linda Sun, Stacy Mosher, and Relator Si were reported as members of an editorial board that "[had] varied scholarly and journalistic qualifications [with e]ach ha[ving] published for over two decades. . .."  Relator never served on nor performed any work for the editorial board.  Moreover, Relator, Yang Lili, Linda Sun, Stacy Mosher, and Yuan Gu are not old enough to have published works for over two decades, thus making this statement knowingly false.

55.     Falsely listing individuals with high qualifications as directors of Corporate Defendants also occurred in proposals and grant applications so as to mislead DOS/NED into believing Corporate Defendants had highly qualified individuals to lead these organizations. For example, Professor Yu Ying-shih, who never served as board director for either Corporate Defendant,[2] was listed as the first director from 2002-present on all grant applications and

_____

[2] Notably, in IRS's annual reports, reviewed by Relator, Corporate Defendants stated under penalty of perjury that Professor Yu served as only advisor to the board.

reports and other materials.  Professor Yu only agreed to be an advisor to the board and, upon information and belief, is not aware of the misuse of his name.

56.     Relator informed Defendant Wu that Corporate Defendants should not hold Professor Yu out as a director, especially given that Professor Yu won the John W. Kluge Prize for the Study of Humanity of the Library of Congress.  Yet, Corporate Defendants, with the assistance of the Individual Defendants fraudulently continue to report Professor Yu as a director to mislead the Government into granting additional funding.

57.     Additionally, the following individuals were also listed in applications to DOS/NED as Board of Director members for the Corporate Defendants but never served in that capacity:  Kerry Kennedy, Maochun Yu, Joseph Brodechi, and Lodi Gyari.

58.     The above fraudulent activities were done intentionally, and/or with deliberate ignorance of their falsity, and/or in reckless disregard of the fact that the bills submitted to the Government were inaccurate or were intentionally fraudulent.

**Fact's With Respect to Relator's Termination**

59.     Relator, after learning about the fraudulent activity, especially the billing of the DOS/NED Program for monies that Corporate Defendants were not entitled to receive, met with and discussed the fraudulent activity as stated above with Defendant Wu and requested that Defendants cease such activity immediately.  For example, in or about the winter of 2005, Relator approached Defendant Wu and spoke with him about the absence of a proper system to account for Corporate Defendant's financial and cash management.  Defendant Wu told Relator that he should "only mind [his] own business."  Defendant Wu then offered to compensate Relator's recent personal laptop with funds from Corporate Defendants.  Relator refused.  To Relator, the offer appeared to be a bribe for Relator to keep quiet.  After this conversation, over the course of the next few months, Defendant Wu repeatedly emphasized

that he could debit Corporate Defendant's accounts to compensate Relator for personal expenses, including offering, in or about February of 2006, to pay Relator for his then recently-purchased, personal-use camera.  Defendant Wu referred to these illegal personal reimbursements as a "benefit" of working for Corporate Defendants.  Relator rejected Defendant Wu's offers.

60.     In or about April 2007, Relator had a conversation with Defendant Wu. Relator told Defendant Wu that he should not use federal money to sponsor a lawsuit against Yahoo! because DOS/NED federal monies were only to be spent on DOS/NED program-related expenses.  During this conversation, Defendant Wu told Relator that what he was doing was appropriate because he was helping people.  As an example of this, Wu told Relator how he had made a fraudulent statement before the United States Congress to assist someone.  Defendant Wu then stated that "Americans are naive and simple.  It is so easy to cheat them."

61.     In or about late January of 2008, Relator had a conversation with Defendant Chen, who was supposedly acting as an accountant for Corporate Defendants and being compensated as such.  During this conversation, Relator stated to Defendant Chen that she should come to the office and perform work instead of staying at home and not performing work for Corporate Defendants.

62.     In or about late March 2008, Relator discussed with Tienchi Martin, a board director for both Corporate Defendants, possible actions that could be taken to correct Defendant Wu's improper, unethical, and illegal conduct with respect to the inappropriate use of funds for the Yahoo! lawsuit. Ms. Martin, in turn, spoke to individual members of the boards for Corporate Defendants about these issues and noted Relator's concerns.

63.     In June of 2008, Relator was terminated by Defendant Wu from his position. In this meeting, Defendant Wu told Relator that the reason for the termination was that Relator "know[s] too much about what I am doing here."  Defendant Wu also threatened physical harm to Relator should he try any additional actions to rectify the above mentioned illegal actions and suggested that Relator should "walk away."  Defendant Wu also offered money to bribe Relator so he would "seal his mouth".

## COUNT I
## False Claims Act 31 U.S.C. §3729(a)(1)(a)

64.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

65.      By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

66.     As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(a) and have damaged the United States by their actions in an amount to be determined at trial.

## COUNT II
## False Claims Act 31 U.S.C. §3729(a)(1)(b)

67.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

68.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(b).

69.     As set forth in the preceding paragraphs, Defendants knowingly violated

31 U.S.C. § 3729(a)(1)(b) and have damaged the United States by their actions in an amount

to be determined at trial.

## COUNT III
## FALSE CLAIMS ACT VIOLATION
(Violation of 31 U.S.C. § 3729(a)(1)(g))

70.     Relator realleges and incorporates by reference the allegations contained in the

foregoing paragraphs of this Complaint.

71.     By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government and/or knowingly concealed or knowingly and

improperly avoided or decreased an obligation to pay or transmit money or property to the

Government in violation of 31 U.S.C. § 3729(a)(1)(g).

72.     As set forth in the preceding paragraphs, Defendants knowingly violated

31 U.S.C. § 3729(a)(1)(g) and have damaged the United States by their actions in an amount

to be determined at trial.

## COUNT IV
## FALSE CLAIMS ACT VIOLATION
(Violation of 31 U.S.C. § 3729(a)(1)(c))

73.     Relator realleges and incorporates by reference the allegations contained in the

foregoing paragraphs of this Complaint.

74.     By virtue of the acts described above, Defendants conspired to defraud the

Government in violation of the FCA.

75.     As set forth in the preceding paragraphs, Defendants knowingly violated

31 U.S.C. § 3729(a)(1)(c) and have damaged the United States by their actions in an amount

to be determined at trial.

## COUNT V
## FALSE CLAIMS ACT VIOLATION – WRONGFUL TERMINATION FOR RELATOR PLAINTIFF SI
(31 U.S.C. § 3730(h))

76.      Relator-Plaintiff incorporates by reference all preceding paragraphs.

77.      As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)(a),(b), (c), and (g) and have damaged the United States by their actions in an amount to be determined at trial.

78.      Defendant Wu on behalf of Corporate Defendants wrongfully terminated Relator.  Relator was a dependable, hard working, skilled, and committed employee.

79.      Defendant terminated Relator because he had objected to Defendants fraudulent conduct as stated above and request that it cease.  In other words, because Relator objected to conduct that reasonably led him to viable FCA claims and because he had access to information that reasonably led him to a viable FCA claim, he was terminated.

80.      31 U.S.C. § 3730(h) protects any employee whose employment is adversely affected as a result of taking actions to further the FCA.

81.      Relator is "entitled to all relief necessary to make the employee whole" including "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."

82.      WHEREFORE, the Relator Plaintiff demands judgment against Defendants jointly and severally in the sum of Two Million Dollars ($2,000,000.00) including actual and punitive (special) damages, and that the Court award the Relator-Plaintiff reasonable attorneys' fees and the costs of this matter, and that the Court award such other and further relief as the cause of justice may require.

## COUNT VI
## PRAYER FOR RELIEF

WHEREFORE, the Relator-Plaintiff on behalf of himself and the United States, prays:

A.      That this Court enter judgment under Counts I through IV against Defendants in an amount equal to three times the amount of damages, including the full value of the contracts Defendants entered into based on the claim of fraudulent inducement, the United States has sustained because of Defendants' actions in violation of 31 U.S.C. § 3729, *et seq.,* plus statutory penalties;

B.      That the Relator-Plaintiff be awarded all costs incurred, reasonable attorney's fees and expenses;

C.      That in the event the United States Government intervenes at the time the action is unsealed and proceeds with this action, the Relator-Plaintiff be awarded an amount of at least 15%, but not more than 25%, of the proceeds of this action or settlement of the claims in Counts I through IV.

D.      That in the event the United States Government does not intervene as set forth above, the Relator-Plaintiff be awarded an amount of at least 25%, but not more than 30%, of the proceeds of this action or settlement of the claims in Counts I through IV;

E.      That the United States Government and Relator-Plaintiff receive all relief, both at law and in equity, to which they are entitled; and,

F.      That a trial by jury be held on all issues.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.


By:   _____
Jay P. Holland  (Bar No. 42258)
jholland@jgllaw.com
Brian J. Markovitz (Bar No. 481517)
bmarkovitz@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
(301) 220-1214 (facsimile)
*Counsel for Relator/Plaintiff*

DATED: December 17, 2009

## **CERTIFICATE OF SERVICE**

I hereby certify that, a copy of the foregoing Complaint, along with a disclosure

statement, will be sent to was sent by Federal Express to:

Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Channing D. Phillips
Acting U.S. Attorney for the District of Columbia
U.S. Department of Justice
501 Third Street, NW, 4th Floor
Washington, DC 20001

Laurie Weinstein, Assistant United States Attorney
U.S. Department of Justice
501 Third Street, NW, 4th Floor
Washington, DC 20001


_____
Brian J. Markovitz