PENCHENG SI,                               )
                                           )
          Plaintiff,                       )
                                           )
          v.                               )          Civil Action No. 09-cv-2388 (KBJ)
                                           )
LAOGAI RESEARCH FOUNDATION,  )
*et al.*,                                  )
                                           )
          Defendants.                      )
                                           )

## MEMORANDUM OPINION

Relator Pencheng Si ("Relator") is a computer technician who once worked for

Defendants Laogai Research Foundation ("LRF") and the China Information Center

("CIC") in the District of Columbia.  Relator brings this action under the False Claims

Act ("FCA"), 31 U.S.C. §§ 3729-3733 (2012), seeking to challenge the business

practices of LRF and CIC (together, "Corporate Defendants") and their executive

director, Harry Wu (collectively, "Defendants") with respect to Defendants' alleged

misuse of federal grant funding.[1]  Relator's central contention is that, during the five

years that he worked for Defendants, he observed them undertaking myriad acts that

Relator believes violate the FCA, including making gross overstatements regarding the

qualifications of Wu and other employees in grant applications, engaging in improper

lobbying activities, and using grant funding for personal expenses.  (*See* Am. Compl.,

ECF No. 43, ¶¶ 126-180.)  The complaint also maintains that Defendants terminated

---

[1] The initial complaint was filed under seal as a *qui tam* action in December of 2009.  (Compl., ECF
No. 2.)  The government declined to intervene in March of 2012 (U.S.'s Notice of Election to Decline
Intervention, ECF No. 14), after which the Court unsealed the complaint for service.  (*See* Order, ECF
No. 15.)

Relator's employment in retaliation for his having unearthed and reported the purported misuse of grant funds. (*Id.* ¶¶ 181-186.)

Before this Court at present is Defendants' second motion to dismiss Relator's complaint with respect to this matter. (Defs.' Mot. to Dismiss Pl.'s Am. Compl. ("Defs.' Mot."), ECF No. 49.) This Court previously agreed with Defendants that Relator's initial complaint was deficient under Federal Rule of Civil Procedure 9(b) and permitted Relator to amend his complaint, *see Si v. Laogai Research Found.*, No. 09-2388, 2013 WL 4478953, at *1-2 (D.D.C. Aug. 21, 2013), which Relator has now done. In the instant motion, Defendants argue that the amended complaint too must be dismissed because Relator's renewed allegations continue to fall short of the requirements of Rule 9(b) and also fail to state a claim upon which relief can be granted for the purpose of Rule 12(b)(6). (Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), ECF No. 50, at 12-23.)[2]

On September 30, 2014, this Court issued an order granting in part and denying in part Defendants' motion to dismiss, and stating that the Court would release a subsequent memorandum opinion explaining the Court's reasoning. (Order ("Sept. 30 Order"), ECF No. 59.) The instant document is that memorandum opinion. In short, the lynchpin of the Court's ruling in this case is the fact that, although Relator appears to have gone back to the proverbial drawing board in crafting the amended complaint (his amended complaint is nearly double the length of his original pleading and provides more detail regarding Defendants' business practices and internal finances), the amended complaint nevertheless still lacks a sufficient factual basis for any

---

[2] Page numbers throughout this Opinion refer to those that the Court's electronic filing system assigns.

plausible fraud claim under the FCA, and fails even to identify clearly how the alleged facts support each purported claim for relief. Therefore, Relator has not cured the deficiencies in the original complaint with respect to the FCA counts (Counts I-IV), and Defendants' motion to dismiss must be **GRANTED** with respect to those counts. As for Relator's remaining contention—that the termination of his employment constituted retaliation for engaging in protected activity in furtherance of the FCA (Count V)—the amended complaint does contain sufficient allegations to raise a plausible inference that Relator engaged in activity that the FCA protects and was fired for that reason. Consequently, Defendants' motion to dismiss is **DENIED** with respect to the retaliation count.

## I.    BACKGROUND

### A.  The Parties

Defendants LRF and CIC are both non-profit corporations based in the District of Columbia. (Am. Compl. ¶¶ 9-10.) LRF has the "the purported purpose to educate Chinese people about the Laogai system" (*id.* ¶ 15), which, according to the New Oxford American Dictionary, is "a system of labor camps, many of whose inmates are political dissidents." New Oxford Am. Dictionary 952 (2nd ed. 2005); *see also id.* (noting that the word "laogai" means "reform through labor" in Chinese). CIC was created and funded "to promote an independent media outlet for Chinese citizens in China unaffected by Chinese government influences." (Am. Compl. ¶ 17.) Both corporations rely on federal grants from the State Department's National Endowment for Democracy ("DOS/NED") program. (*Id.* ¶¶ 14-18.)

Relator worked for LRF and CIC from May of 2003 until he was fired in June of 2008. (*Id.* ¶ 7.) Defendants originally hired Relator as a computer technician, but during his time as an employee of LRF and CIC, Relator acquired new titles—such as Assistant Director of CIC—and new responsibilities. (*Id.*) At the same time that Relator was advancing professionally, he also began learning more about the inner workings of the organizations and became increasingly concerned about what he viewed as unlawful conduct. (*See id.*) Such conduct ranged from alleged minor frauds (*e.g.*, Defendant Wu exaggerating his life story) to alleged egregious illegalities (*e.g.*, Defendant Wu embezzling Corporate Defendants' money).

It appears undisputed that Defendant Wu was, for all intents and purposes, the controlling force behind LRF and CIC when Relator worked for those organizations. (*Id.* ¶ 12.) Before arriving in the United States from China in the 1980s, Wu spent some period of time detained in a Chinese forced labor camp. (*See id.* ¶¶ 30-42 (pointing to inconsistencies in Wu's story but not disputing that he spent some time in a Chinese prison)). Wu is now President and Executive Director of LRF and the Publisher of CIC. (*Id.* ¶ 12.) According to Relator, Wu is also a font of ethical and financial impropriety.

### B. The Amended Complaint

This lawsuit stems primarily from a series of allegedly unlawful acts that Relator purportedly witnessed in his capacity as an employee of LRF and CIC, as well as facts relating to the manner in which Relator was fired. Relator's sprawling amended complaint contains more than one hundred paragraphs of allegations that, as a general matter, appear to emphasize six different types of allegedly unlawful behavior on the

part of Defendants: (1) Defendant Wu made misrepresentations regarding his personal story; (2) LRF and CIC engaged in illicit lobbying; (3) Defendants made improper payments to third parties in violation of their grant obligations; (4) Defendant Wu submitted fraudulent claims for reimbursement; (5) Defendants made misrepresentations in grant applications; and (6) Defendants unlawfully terminated Relator's employment in retaliation for his having raised concerns about the aforementioned conduct.  (*Id.* ¶¶ 24-125.)  The amended complaint provides myriad examples of specific acts that relate to each of these categories of conduct, and according to Relator, these facts raise plausible legal claims that relate to five different provisions of the FCA.  (*See id.* ¶¶ 126-186 (alleging violations of 31 U.S.C. § 3729(a)(1)(A) (Count I), 31 U.S.C. § 3729(a)(1)(B) (Count II), 31 U.S.C. § 3729(a)(1)(G) (Count III), 31 U.S.C. § 3729(a)(1)(C) (Count IV), and 31 U.S.C. § 3730(h) (Count V)).)  The alleged facts and asserted causes of action are summarized as follows.

     1.  Allegations Of Fact

     *a.  Defendant Wu Misrepresented His Personal Story*

The first type of misconduct Relator alleges in his amended complaint is that Defendant Wu "aggrandize[d] and embellish[ed] his experiences and background in China so as to create a persona of the persecuted, victimized intellectual who had to flee China."  (*Id.* ¶ 26.)  To bolster this claim, Relator points to a number of examples of Wu providing inconsistent explanations regarding the reasons for his imprisonment in a forced labor camp and the length of time he spent in that camp.  (*Id.* ¶¶ 30-37 (pointing to at least four different explanations Wu has given for his own imprisonment:

(1) he had criticized the Soviet invasion of Hungary, (2) he had skipped school, (3) he had stolen money, and (4) he was wealthy and Catholic).)  Relator also claims that Wu has lied about the activities he engaged in after arriving in the United States from China by falsely claiming to have been a visiting geology professor at the University of California, for example, and by exaggerating his connection to the Hoover Institution of Stanford University.  (*Id.* ¶¶ 38-42.)

### b.  LRF And CIC Engaged In Illicit Lobbying

The amended complaint also catalogues in great detail dozens of examples of circumstances in which Corporate Defendants allegedly engaged in lobbying in contravention of an explicit certification that no grant funding would be spent on such activities.  (*Id.* ¶¶ 50-75.)[3]  For example, Corporate Defendants allegedly lobbied a number of congressmen with the intent that they would support an increase in the budgets of LRF and CIC.  (*Id.* ¶¶ 52-54, 56, 58, 63.)  The amended complaint also alleges that Defendants "hosted conferences and/or receptions [for] members of Congress" (*id.* ¶ 66), wrote letters to and met with members of Congress, advocating for certain bills and policy positions (*id.* ¶¶ 59, 61, 65, 67-70), and even contributed financially to at least one election campaign (*id.* ¶ 64).

Notably, in addition to providing numerous examples of Corporate Defendants' allegedly illegal lobbying efforts, the amended complaint also alleges that the government specifically warned Defendants about their improper lobbying efforts on at least two occasions.  In 2004, government officials overseeing the DOS/NED grant process purportedly warned Defendants not to lobby with federal funds.  (*Id.* ¶ 71.)

---

[3] Relator maintains that, in order to receive and retain their federal grant money, Corporate Defendants had to certify that none of the money would be spent on lobbying.  (Am. Compl. ¶ 44.)

Then in 2006, government officials went even further, sending an email "express[ing] . . . disappointment with the fact that a significant portion of LRF's work was influencing the U.S. Government and inform[ing] Defendant Wu that LRF need[ed] to shift its efforts to LRF's 'goal' of ending gross human rights violations." (*Id.* ¶ 49.)

       c.  *Defendants Made Improper Payments To Third Parties In Violation of Their Grant Obligations*

Relator also alleges that LRF and CIC—through Defendant Wu—made numerous fraudulent payments to third parties using federal grant money. Much like the list of alleged lobbying violations, Relator gives extensive examples of these supposedly improper payments—*e.g.*, payments to friends of Wu for work that was never performed, payments to other non-profit corporations, payments to contractors providing personal services to Wu rather than services to Corporate Defendants, and payments to Wu himself for personal expenses. (*Id.* ¶¶ 76-82, 86.)

The amended complaint contains only two instances where Corporate Defendants are alleged to have made statements to the government regarding payments to third parties: at one point, Relator alleges that LRF and CIC "submit[ted] falsified documentation" to the government regarding use of grant funding that was, in fact, used for personal expenses (*id.* ¶ 86), and at another point, Relator alleges that Corporate Defendants falsely reported that no government funds were being spent on an ongoing lawsuit (*id.* ¶ 96). No details are provided about the form or nature of these submissions to the government.

       d.  *Defendant Wu Made Fraudulent Claims For Reimbursement And Improperly Retained Fees*

Relator's allegations regarding Defendant Wu's false or fraudulent receipt of funds for his own personal use appear to come in two varieties. First, Relator alleges

that Defendant Wu "often travelled for personal reasons but had [the State Department] pay for that travel." (*Id.* ¶ 88.) According to the amended complaint, in order to accomplish this, "Wu, with the assistance of his wife, created false timesheets, travel authorizations, receipts for hotels and other expenses," and that these false documents formed the basis of the reimbursement. (*Id.*) Defendants had apparently certified at some unspecified prior time that timesheets submitted for reimbursement would be accurate. (*Id.* ¶ 89.)

Second, in addition to claiming fraudulent reimbursements for personal travel expenses, Relator claims that Wu failed to turn over additional speaking and travel fees to Corporate Defendants. (*Id.* ¶¶ 87, 94.) By keeping this money as well as the reimbursement from the government, Wu allegedly obtained "double recovery." (*Id.*) Although Relator does not say so explicitly, the amended complaint suggests that such double recovery is improper and that Wu had an obligation to disclose these speaking and travel fees to the government. The amended complaint claims that Wu did not disclose this double recovery to the government. (*Id.*)

> e. *Defendants Made False Representations In Grant Applications*

The broad contention that Defendants made false representations in grant applications is repeated at various times throughout the amended complaint. Relator begins by alleging that LRF has been receiving grant funding from the State Department since at least 1992, and that CIC has been receiving grant funding from that same source since at least 2002. (*Id.* ¶¶ 15, 17.) Relator also states that CIC's funding is renewed annually. (*Id.* ¶ 17.) Regarding the alleged misrepresentations in those applications, the amended complaint mostly contains very general contentions. (*See,*

*e.g., id.* ¶ 2 ("Corporate Defendants, with the assistance of Defendant Wu, knowingly submitted, caused to be submitted and/or facilitated the submission of false and fraudulent documents . . . in order to secure payments which were used by Defendants for prohibited and unauthorized uses.").)

The complaint provides two examples of allegedly false statements in Defendants' grant applications. First, according to Relator, the grant applications falsely included the exaggerations about Defendant Wu's life story described above. (*Id.* ¶¶ 29, 41-42.) Second, the complaint alleges that Defendants' grant applications misrepresented who was on their board of directors. (*Id.* ¶ 109-11.) For example, Defendants allegedly listed a Professor Yu Ying-shih as a "Director," when in fact he had merely agreed to advise the board. (*Id.* ¶ 109.)

### f. Defendants Unlawfully Terminated Relator Because He Raised Concerns About Their Unlawful Conduct

The final category of factual allegations in the amended complaint concerns Relator's contention that he was terminated in retaliation for engaging in protected activity under the FCA. (*See id.* ¶¶ 181-186.) Relator recounts several conversations in which he allegedly expressed concern about Defendants' misuse of funds and "the billing of the DOS/NED Program for monies that Corporate Defendants were not entitled to receive[.]" (*Id.* ¶ 113.)

First, Relator alleges that he approached Wu in 2005 to "sp[eak] with him about the absence of a proper system to account for Corporate Defendant[s'] financial and cash management." (*Id.*) According to the amended complaint, Wu responded by telling Relator to "mind [his] own business," and then offered to reimburse Relator for the cost of his personal laptop using company funds. (*Id.* (alteration in original).)

Relator alleges that he met with Wu again in February of 2006 to discuss Wu's misuse of funds for personal expenses (*id.* ¶ 115), and that he also discussed with Wu the misuse of funds for a private lawsuit in April of 2007 (*id.* ¶ 116). Relator next alleges that he had a conversation with Wu's wife, Chinglee Chen (Corporate Defendants' accountant) in January of 2008, in which Relator told Chen that she should come to the office to work instead of staying home. (*Id.* ¶ 117.)

Relator also contends that, in March of 2008, he spoke with a member of the board of both Corporate Defendants, Tienchi Martin, to discuss "possible actions, internal and external, that could be taken to correct Defendant Wu's improper, unethical, and illegal conduct with respect to the inappropriate use of funds" for the aforementioned private lawsuit. (*Id.* ¶ 118.) According to Relator, Martin shared the concerns with other board members, and Wu found out about these conversations. (*Id.* ¶¶ 118-19.) Three months later, Wu terminated Relator's employment, allegedly noting that Relator "kn[ew] too much about what [Wu is] doing" and issuing threats and bribes to prevent Relator from revealing the alleged fraud. (*Id.* ¶ 120.) According to Relator, since his termination, Wu and other employees of the Corporate Defendants have continued to retaliate against him through slander and intimidation. (*See id.* ¶¶ 121-125.)

## 2. Legal Actions (Counts)

Without specifically linking any of the types of conduct or examples that Relator details to any particular legal cause of action, Relator's amended complaint maintains generally that all of the actions of Defendants described above constitute one or more violations of the FCA. Citing different provisions of that statute, Relator sets forth five

FCA-related counts. Count I is brought under 31 U.S.C. § 3729(a)(1)(A), and maintains that "Defendant[s] knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval[.]" (*Id.* ¶ 127.) Count II is brought under 31 U.S.C. § 3729(a)(1)(B), and maintains that "Defendants knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the Government[.]" (*Id.* ¶ 140.) Count III is brought under 31 U.S.C. § 3729(a)(1)(G), and maintains that "Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government[.]" (*Id.* ¶ 164.) Count IV is brought under 31 U.S.C. § 3729(a)(1)(C), and maintains that "Defendants conspired to defraud the Government[.]" (*Id.* ¶ 179.) Finally, Count V is brought under 31 U.S.C. § 3730(h), and maintains that "Defendant[s] terminated Relator because he had objected to Defendants fraudulent conduct[.]" (*Id.* ¶ 184.)

Notably, although each of the counts specifically states that certain paragraphs of the prior recitation of facts are "re-allege[d] and incorporat[ed] by reference" (*id.* ¶¶ 126, 139, 152, 166), the *same* comprehensive set of paragraph citations—*all* of the facts previously alleged in the complaint—are listed for each of the complaint's first four counts. This means that none of the fraud counts in the amended complaint specifies which particular set of facts Relator believes support the count. Moreover, the first four counts themselves contain no meaningful differentiation, since the same ten paragraphs of broad boilerplate text are recited as the substance of each count,

11

including such generalized statements as "LRF and CIC sought grants and funds from [the] United States and in order to receive the grants and funds made representations that were not true and made these misrepresentations intentionally" (*id.* ¶¶ 128, 141, 153, 167), and "[t]he Defendants not only were awarded grant funds when they should not have been but they also caused most of the grant funds, if not all of the grant funds[,] to be misused because they were used primarily for lobbying, which fell outside the stated purpose of the grant" (*id.* ¶¶ 135, 148, 160, 174).

## C. Procedural History

Relator first filed the instant lawsuit on December 17, 2009. (*See* Compl., ECF No. 2.) After the Government declined to intervene in March of 2012 (*see* U.S.'s Notice of Election to Decline Intervention, ECF No. 14), Relator served the initial complaint on Defendants in January of 2013. (*See* Affs. of Service, ECF Nos. 23-26.) In April of 2013, Defendants moved to dismiss that complaint. (*See* Defs.' Mot. to Dismiss, ECF No. 29.)

On August 21, 2013, this Court ruled on Defendants' motion to dismiss, ordering Relator to clarify the complaint. In particular, the Court faulted the recitation of counts in the complaint for "realleg[ing] and incorporat[ing] by reference all sixty-three paragraphs of factual background" without providing any "indication of the specific facts pertaining to each claim." *Si*, 2013 WL 4478953, at *1. The Court also found that, because the complaint did not clearly establish which allegations pertain to which count, "the Court [was] unable to determine whether Si states a claim for relief under each count with sufficient specificity." *Id.* (citation omitted). The Court also warned

Relator that the complaint, as written, failed to plead fraud with particularity as Federal Rule of Civil Procedure 9(b) requires. *See id.*

In the wake of this Court's ruling regarding the deficiency of the initial complaint, Relator filed an amended complaint in which he added 104 new paragraphs containing a barrage of new facts, most of which give color to Defendants' business practices and finances, and describe conduct that does not appear to be related to statements or submissions to the government.[4] Defendants now seek dismissal once again, arguing that the amended complaint fares no better than its predecessor. (*See* Defs.' Mot. at 1.) Defendants' motion to dismiss has been fully briefed, and is now ripe for the Court's consideration.[5]

## II. LEGAL STANDARDS

### A. Motions To Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must comply with Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This requirement is meant to "give the defendant fair notice of what the . . . claim is and the grounds upon

---

[4] The amended complaint also withdrew claims against Defendant Chinglee Chen, Wu's wife, who served as the accountant for Corporate Defendants. (*See* Relator's Mem. in Supp. of his Opp'n to Defs.' Mot. ("Relator's Opp'n"), ECF No. 52, at 2 n.1 ("[I]n an attempt to streamline this litigation, Relator has dropped the claims against Chinglee Chen.").)

[5] The animosity between Relator and Defendants comes through clearly in the various filings the parties have submitted in support of, and in opposition to, the motion to dismiss—Defendants accuse Relator of slandering them "for his own political purposes and/or in an effort to extort some financial settlement" (Defs.' Mem., at 6), while Relator accuses Defendants of "smearing [Relator's] reputation" (Relator's Opp'n at 3). It is not this Court's role to deal with unsubstantiated accusations not contained in the pleadings, however; consequently, this Court is only concerned with the viability of the complaint's allegations relating to Defendants' breach of the FCA.

which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

"Although 'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133 (D.D.C. 2013) (quoting *Twombly*, 550 U.S. at 555). In other words, the plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[M]ere conclusory statements" of misconduct are not enough to make out a cause of action against a defendant. *Id.* Rather, a complaint must contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In deciding whether to grant a motion to dismiss under Rule 12(b)(6), "[t]he court must view the complaint in [the] light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Busby*, 932 F. Supp. 2d at 134. Even so, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor is the court "bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

## B. Motions To Dismiss Under Rule 9(b)

Federal Rule of Civil Procedure 9(b) applies to FCA fraud actions. *See United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) (noting that every circuit to consider the issue has held that Rule 9(b) applies to FCA complaints). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b), which are: to "ensure that defendants have adequate notice of the charges against them to prepare a defense," *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003); to discourage "suits brought solely for their nuisance value," *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981); and to "'protect reputations of . . . professionals from scurrilous and baseless allegations of fraud.'" *Id.* at 1385 n.103 (alteration in original) (quoting *Felton v. Walston & Co., Inc.*, 508 F.2d 577, 581 (2d Cir. 1974)).

Rule 9(b) does not abrogate Rule 8, and must be read in light of Rule 8's requirement that allegations be simple, concise, and direct, and that the complaint contain short and plain statements of each claim. *Joseph*, 642 F.2d at 1386; *see also United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 269 (D.D.C. 2002) ("While . . . Rule 9(b) requires more particularity than Rule 8, . . . Rule 9(b) does not completely vitiate the liberality of Rule 8."). In an FCA fraud action, Rule 9(b) requires, at a minimum, that the pleader "state the time, place and

content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud" and "individuals allegedly involved in the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (internal quotations marks and citation omitted). "In sum, although Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years, defendants must be able to 'defend against the charge and not just deny that they have done anything wrong.'" *Id.* at 1259 (quoting *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001)); *see also McCready*, 251 F. Supp. 2d at 116 (noting that a court "'should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts'" (quoting *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999)).

### C. Fraud And Retaliation Actions Brought Under The FCA

Generally speaking, the FCA "provides a cause of action for private parties, known as 'relators,' to bring suits on behalf of the federal government for false or fraudulent statements made to the government." *United States ex. rel. Tran v. Computer Sciences Corp.*, No. 11-CV-0852 (KBJ), 2014 WL 2989948, at *7 (D.D.C. July 3, 2014). At the time of the great majority of the conduct giving rise to the instant litigation, the FCA used slightly different nomenclature and a different numbering convention than exists in the statute today; it imposed liability on any person who

> (1) knowingly presents, or causes to be presented, to an officer
> or employee of the United States Government . . . a false or

fraudulent claim for payment or approval; [or] (2) knowingly
makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by
the Government[.]

31 U.S.C. § 3729(a)(1)-(2) (2008).  Then, as now, an actionable false "claim" for the

purpose of the FCA was defined broadly to include "any request or demand, whether

under a contract or otherwise, for money or property which is made to a contractor,

grantee, or other recipient if the United States Government provides any portion of the

money or property which is requested or demanded[.]"  *Id.* § 3729(c).  In addition, all

plaintiffs bringing private actions under the FCA were, and are, required to allege that

the allegedly false claim was material to the government's decision to make the

payment at issue.  *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 194

(D.D.C. 2011).  "A false statement is 'material' under the FCA if it has a natural

tendency to influence agency action or is capable of influencing agency action."  *United*

*States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 28 (D.D.C. 2011); see also

*United States ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Grp., Inc.*, 370 F. Supp. 2d

18, 46 (D.D.C. 2005) ("For a violation to give rise to false claims liability . . .

compliance with the presented claim must have been so important to the contract that

the government would not have honored the submission for payment on the claim if it

were aware of the violation.").

On May 20, 2009, Congress amended the FCA by enacting the Fraud

Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 stat. 1617.

The current, post-FERA version of the FCA establishes liability for any person who

(A) knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval; [or] (B) knowingly

> makes, uses, or causes to be made or used, a false record or
> statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1)(A)-(B) (2012). With the exception of FCA suits that have been

brought under 31 U.S.C. § 3729(a)(1)(B) and that were pending on June 7, 2008, the

FERA amendments to the FCA are not retroactive, which means that the pre-FERA

version of the statute applies to conduct that occurs prior to May 20, 2009—the date on

which the amendments were enacted.

### 1. Presentment and False Statement Actions

A lawsuit alleging that a defendant made a false claim for payment in violation

of section 3729(a)(1)(A) (or its predecessor section 3729(a)(1)) is commonly known as

a "presentment" action. *See* Joel M. Androphy, *Federal False Claims Act & Qui Tam

Litigation* § 4.03[1] (2014); *see also Head*, 798 F. Supp. 2d at 196. In such actions, the

relator maintains that the defendant made a material "presentment claim"—*i.e.,* an

"explicitly false or fraudulent demand[] for payment[.]" *Head*, 798 F. Supp. 2d at 196.

A count brought under 31 U.S.C. § 3729(a)(1)(A) has three elements: "'(1) the

defendant submitted a claim [for payment] to the government, (2) the claim was false,

and (3) the defendant knew the claim was false.'" *United States ex rel. Folliard v.

CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010) (quoting *United States ex

rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 134 (D.D.C.

2010)).

A lawsuit brought under section 3729(a)(1)(B)—referred to herein as a "false

statement action"—is "complementary" to a count brought under section 3729(a)(1)(A),

because subsection (a)(1)(B) is "designed to prevent those who make false records or

statements [in order] to get claims paid or approved from escaping liability solely on

the ground that they did not *themselves* present a claim for payment or approval."

*United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004)

(emphasis in original).  Reflecting this, the elements for a count brought under section

3729(a)(1)(B) are practically identical to the requirements for a count brought under

section 3729(a)(1)(A).  *See Folliard*, 722 F. Supp. 2d at 36.  The only notable

difference is that, as the language suggests, section 3729(a)(1)(B) requires evidence that

the defendant made a false *statement* to the government, as opposed to the submission

of a false claim for payment.  *Compare* 31 U.S.C. § 3729(a)(1)(B) *with id.*

§ 3729(a)(1)(A).

    A number of different legal theories can support a cause of action brought under

either or both of sections 3729(a)(1)(A) and 3729(a)(1)(B).  While the "paradigmatic"

presentment action maintains that the defendant made "'an incorrect description of

goods or services provided or a request for reimbursement for goods or services never

provided[,]'" *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C.

Cir. 2010) (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), this is just the

most common means of establishing a presentment count—not the *only* means—and is

therefore just one of a number of possible theories that can support liability under

section 3729(a)(1)(A).  Indeed, in addition to the classic 'presentation of a false claim'

or 'making of a false statement' scenario, some courts permit a relator to establish a

presentment or false statement count on the basis of (a) a fraudulent inducement theory,

*see, e.g.*, *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d

1321, 1326 (D.C. Cir. 2005), *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 46

(D.D.C. 2011), (b) a false certification theory, *see, e.g.*, *United States ex rel. Hendow v.*

*Univ. of Phx.*, 461 F.3d 1166, 1171-73 (9th Cir. 2006); *Foglia v. Renal Ventures Mgmt., LLC*, 830 F. Supp. 2d 8, 17 n.9 (D.N.J. 2011), and/or (c) a worthless service theory, *see, e.g.*, *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 158 (E.D. Pa. 2012). The fraudulent inducement and false certification theories arise in the context of this case, and thus warrant a brief description.

The fraudulent inducement theory prescribes liability "for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *Bettis*, 393 F.3d at 1326; *see also* S. Rep. No. 99-345, at 9 (1986) ("[E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim."). The theory turns on the defendant's "eligibility" for payment by the government—"had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 69 n.33 (D.D.C. 2007).

The D.C. Circuit has also long recognized an "implied" false certification theory, which provides that FCA liability may attach where the relator shows that the defendant "withheld information about its noncompliance with material contractual requirements" despite having earlier promised—*i.e.*, certified—that it would comply with those requirements. *Sci. Applications Int'l Corp.*, 626 F.3d at 1269; *see also Head*, 798 F. Supp. 2d at 196. A relator may establish implied false certification by pointing to "express contractual language linking compliance to eligibility for payment[,]" or in

20

other ways, such as by alleging that "both parties to the contract understood that payment was conditional on compliance with the requirement at issue." *Sci. Applications Int'l Corp.*, 626 F.3d at 1269. Importantly, a relator "must prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay." *Id.* at 1271.

### 2. "Reverse" FCA Actions

Section 3729(a)(1)(G) of Title 31 of the U.S. Code provides a cause of action where the defendant has made what is commonly known as a "reverse" false claim. *United States ex rel. Landis v. Tailwind Sports Corp.*, No. 10-cv-00976, 2014 WL 2772907, at *30 (D.D.C. June 19, 2014). A reverse false claim is any fraudulent conduct that "'results in no payment to the government when a payment is obligated.'" *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 63 n.1 (D.C. Cir. 2008) (quoting *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004)). Section 3729(a)(1)(G) specifically imposes liability on any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. § 3729(a)(1)(G). Whereas a traditional false claim action involves a false or fraudulent statement made to the government to support a claim for money from the government, a typical reverse false claim action involves a defendant knowingly making a false statement in order to *avoid* having to pay the government when payment is otherwise due. *United States v. Caremark, Inc.*, 634 F.3d 808, 814-15 (5th Cir. 2011).

Notably, the existing "reverse false claim" statutory provision is broader than the pre-FERA version, which had imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (2006). The amended statute made two major revisions relevant to reverse false claim actions. First, it expanded the type of conduct underlying a reverse false claim action to include presentment (*i.e.*, making a claim-related submission) as well as a material false statement, thereby mirroring sections 3729(a)(1)(A) and 3729(a)(1)(B). *See* S. Rep. No. 111-10, at 14 (2009) ("[FERA] closes this loophole and incorporates an analogous provision to 3729(a)(1) for 'reverse' false claims liability."). Second, it broadened the relevant payment "obligation" to address what Congress saw as the overly narrow interpretation of the word "obligation" that some courts had adopted. *See* S. Rep. No. 111-10, at 13-15 (discussing judicial disagreement over the definition); *see also id.* at 15 (recognizing that the new definition extends liability to situations where a party willfully prevents having to repay the government for sums mistakenly received). Whereas the pre-FERA version of the FCA did not contain any definition of obligation, thereby leaving that task to judicial interpretation, current section 3729(b)(3) defines obligation as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" 31 U.S.C. § 3729(b)(3).

As will be described below, the parties here vigorously dispute which definition of "obligation" is applicable to the circumstances presented in this case.

### 3. Conspiracy

Also relevant here is 31 U.S.C. § 3729(a)(1)(C), which imposes liability for "conspir[ing] to commit a violation of" the FCA. To state a cause of action for conspiracy under this statutory provision, the relator must allege (1) that "an agreement existed to have false or fraudulent claims allowed or paid" to the government, (2) that each alleged member of the conspiracy "joined that agreement," and (3) that "one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010) (citations omitted). General civil conspiracy principles apply to FCA-based conspiracy actions. *Head*, 798 F. Supp. 2d at 201 (D.D.C. 2011). For example, following these general civil conspiracy principles, courts have applied the intra-corporate (or intra-enterprise) conspiracy doctrine in conspiracy actions brought under the FCA. *Id.* Under this doctrine, one entity "cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves." *Id.* (internal quotation marks and citation omitted). Another important civil conspiracy principle is that no conspiracy can exist without "some underlying tortious act." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). In the context of the FCA, this means that there can be no liability for conspiracy where there is no underlying violation of the FCA. *See United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998) (dismissing a conspiracy action because, among other things, the alleged fraudulent actions of defendants were "entirely lawful" and did not violate the FCA).

4. Retaliation

Finally, the FCA also provides some measure of protection against retaliation for relators who choose to take action "in furtherance of" the objectives of the FCA. *See* 31 U.S.C. § 3730(h). The statute that was in effect when Relator's employment was terminated specifically provided that

> [a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2006).[6] The retaliation provision of the FCA "was designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime." *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012) (internal quotation marks and citation omitted). To state a cause of action for retaliation, a relator "must demonstrate that: (1) he engaged in protected activity, that is, 'acts done . . . in furtherance of an action under this section'; and (2) he was discriminated against 'because of' that activity." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (quoting 31 U.S.C. § 3730(h)).

---

[6] Defendants terminated Relator in June of 2008. (Am. Compl. ¶ 120.) Because that action occurred prior to the FERA amendments in May of 2009, the pre-FERA statute applies. *See Head*, 798 F. Supp. 2d at 194 n.10. Although Relator also alleges that Defendants have continued to retaliate against Relator after his termination by, *inter alia*, threatening and harassing him and defaming his name on the internet and in the Chinese community, the amended complaint makes clear that these actions occurred *after* he left his job at Corporate Defendants. (*See* Am. Compl. ¶¶ 121-122.) Thus, this purportedly-retaliatory conduct did not affect "the terms and conditions of employment," which is the only conduct that the FCA retaliation provision protects. 31 U.S.C. § 3730(h).

### III. ANALYSIS

In the swirl of facts presented in Relator's amended complaint, it is exceedingly difficult to determine which of the specific factual allegations regarding the Defendants' conduct are intended to support each count. Indeed, with the exception of the allegations of fact that relate to Relator's firing, Relator has not clearly specified which alleged facts relate to each count, and to the extent that some of the FCA fraud actions can be proved by multiple theories, Relator has also failed to indicate which legal theory underpins each count. For this reason alone, a conclusion that Relator's fraud-related FCA counts should be dismissed for failure to state a claim under Rule 12(b)(6)—or at the very least for failure to satisfy Rule 8(a)(2)'s command of a "short and plain statement of the claim showing that the pleader is entitled to relief"—is warranted. *See Rice v. Dist. of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011) ("An individual count must contain a plausible recitation of enough facts to support it."). But even if the nearly impenetrable nature of the complaint is overlooked, it is clear that Relator's fraud actions fall short of the applicable pleading standards. As explained below, this Court has examined the alleged facts and claims from every angle and has evaluated Defendants' dismissal arguments based on what Realtor may have intended with respect to how the facts relate to the causes of action he brings. And even when the amended complaint is so liberally construed, this Court still can only discern sufficient allegations to support Relator's retaliation count. In other words, because Relator has manifestly failed to craft a pleading that states any fraud action in a manner that satisfies the standards of Rules 12(b)(6) and 9(b), Counts I–IV of the amended complaint must be dismissed.

## A. Relator's Presentment And Material False Statement Actions (Counts I-II) Do Not Satisfy The Requirements Of Rules 12(b)(6) Or 9(b)

The first two counts of the amended complaint are for presentment of false or fraudulent claims for payment under 31 U.S.C. § 3729(a)(1)(A) (Count I), and knowing use of false records and statements to get false claims paid or approved under 31 U.S.C. § 3729(a)(1)(B) (Count II).[7]

### 1. Relator's Presentment Theory

As stated above, a cause of action under 31 U.S.C. § 3729(a)(1)(A) has three elements:  "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false."  *Folliard*, 722 F. Supp. 2d at 26. Of all the facts alleged in Relator's amended complaint, the only examples that appear to qualify as potentially meeting the elements of a presentment action are those allegations that are related to Defendant Wu being improperly reimbursed for travel expenses.  Relator alleges that Wu fraudulently submitted falsified travel expenses to the government and was reimbursed for those expenses.  (Am. Compl. ¶¶ 87-93.)  If Relator did, in fact, intend for the allegations regarding reimbursement to form the basis of his presentment action, these facts satisfy the requirements of Rule 12(b)(6) because Relator sufficiently alleges that Wu deliberately requested money for work-related expenses even though these expenses were not work-related.  (*See id.*)

However, even though Relator may have stated a presentment theory with respect to the reimbursement allegations for the purpose of Rule 12(b)(6), that theory

---

[7] Relator's claims under Counts I and II do not implicate the changes contained in the FERA amendments because, with respect to presentment actions, the thrust of the amendments was to make it easier to bring an FCA action when the misrepresentation was presented to a *contractor* or *grantee* as opposed to an employee of the government, *see* S. Rep. No. 111-10, at 11-12, and none of Relator's allegations involve false claims made to government contractors or grantees.

nevertheless fails to satisfy the heightened pleading standards of Rule 9(b). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake[,]" Fed. R. Civ. P. 9(b), but Relator fails to provide basic information about any submission of a claim for payment or Wu's receipt of a reimbursement. One indicia of the lack of clear information about the alleged reimbursements is the fact that Relator mixes allegations that Wu was improperly paid with grant funds with allegations that Wu was improperly reimbursed by the government. (*See id.* ¶ 87 (alleging that Wu received improper payments from the government and then clarifying that these payments came from Corporate Defendants rather than directly from the government).) In this regard, Relator maintains that the government "reimbursed Defendant Wu and his wife based on" "false timesheets, travel authorization, receipts for hotels and other expenses" (*id.* ¶ 88), but it is not at all clear whether Relator is alleging that Wu was directly reimbursed by the government or whether he just improperly received additional money from Corporate Defendants' grant funding—a specificity that matters because one of the main elements of a presentment action is the submission of a claim to the government. *Folliard*, 722 F. Supp. 2d at 26. A similar haze surrounds Relator's claim that Wu was improperly reimbursed for personal expenses. Relator alleges that Wu "was paid by the DOS/NED program" (*id.* ¶ 92), but fails utterly to explain *how* the payments were made and whether Wu got paid after submitting a false claim to the government. In short, because the amended complaint lacks specificity regarding how the claims for reimbursement were submitted and how Wu was reimbursed based on these claims, it plainly fails to satisfy Rule 9(b)'s heightened pleading standard. *See Martin v. Arc of D.C.*, 541 F. Supp. 2d 77, 83

(D.D.C. 2008) ("[T]he complaint . . . fails to provide any of the purported details such as the time, place, and contents of the alleged false representation.").

Relator argues, with some support, for a relaxed application of Rule 9(b) when the fraud at issue is relatively complex. *See Head*, 798 F. Supp. 2d at 203 ("For fraudulent schemes that are particularly complex or extensive, Rule 9(b)'s pleading requirements may be further relaxed."); *accord United States ex rel. Bender v. N. Am. Telecomm., Inc.*, 686 F. Supp. 2d 46, 52 (D.D.C. 2010); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 7-8 (D.D.C. 2003). To the extent that there is complexity to this case, however, it appears to be complexity of Relator's own making. As this Court has emphasized, the examples of Defendants' behavior that in any way relate to claims made to the government for payment are actually quite few in number—the deluge of irrelevant examples of supposed misconduct on the part of Defendants cannot be permitted to obscure Relator's failure to plead adequately those allegations that *are* within the scope of the FCA.

Relator also points to misconduct other than reimbursement of falsified travel expenses as potentially giving rise to a presentment action (*see* Relator's Mem. in Supp. of his Opp'n to Defs.' Mot. ("Relator's Opp'n"), ECF No. 52, at 20-22), but none of those instances satisfy the three elements noted above. For example, Relator notes that Defendants did not fully abide by the terms of their grant funding (*id.* at 21). This may be so; however, failure to abide by the terms of a grant does not, in itself, involve submitting a claim to the government. Relator also argues that the amended complaint provides details about other circumstances in which employees improperly billed the government (*id.*), and he cites two paragraphs that illustrate this improper billing (*see*

Am. Compl. ¶¶ 80, 107).  The first paragraph establishes no such thing—it states only that the employees were paid with grant funds, not that they were directly paid by the government—and the second merely says that incorrect information "was reported" to the government without any allegation that this report was in any way connected to a claim for payment.  Only Relator's reimbursement allegation satisfies Rule 12(b)(6) and even that claim fails to satisfy Rule 9(b).

### 2.  Relator's Fraudulent Inducement Theory

As explained above, a cause of action can be stated under FCA section 3729(a)(1)(B) when, among other things, a defendant has made a false statement that fraudulently induced payment or approval by the government.  In his opposition brief, Relator maintains that the alleged factual basis for finding that the FCA was violated under a "false inducement" theory is the supposed exaggeration of Defendant Wu's life story and misrepresentations about other "key personnel," (Relator's Opp'n at 25-26), including, presumably, misrepresentations about the directors of Corporate Defendants.  (*See* Am. Compl. ¶¶ 109-111.)  The amended complaint does list several examples of reportedly false statements or inconsistencies that Wu made in publications, brochures, and other media (*see, e.g.*, *id.* ¶¶ 30-37), and also in a 2007 affidavit to the Department of Justice's Executive Office of Immigration review (*id.* ¶ 38).  But, as alleged, these examples generally bear no relationship to a false statement made *to the government* in connection with a requested claim *for payment*.  *See United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 136 (D.D.C. 2010) ("[F]raud is pled if a plaintiff alleges fraud in the inducement for payment.").

Only one example in the complaint satisfies the foundational requirement that the defendant has made a false statement to the government in connection with a request for money: the allegation that the exaggerations regarding Wu's background were included in Defendants' grant applications. (*See* Am. Compl. ¶¶ 29, 41-42.) With respect to that one potential instance of fraud, however, Relator fails to allege materiality, even while devoting many paragraphs to describing the manner in which Wu overstated or misstated his qualifications as a labor camp veteran. That is to say, although Relator has detailed several statements allegedly made in grant applications that he maintains are gross mischaracterizations of Wu's history, Relator has ignored his obligation to allege facts from which this Court could infer that the State Department would not have awarded Corporate Defendants funding had they known that Wu had spent fewer years imprisoned in a Chinese prison labor camp than he reported. (*See id.* ¶¶ 28-43.) And the same deficiency applies to Relator's allegation that Corporate Defendants falsely listed certain individuals as serving on their board of directors in their grant applications. (*Id.* ¶¶ 109, 111) Rule 12(b0(6) is not satisfied because Relator fails to offer any factual basis, plausible or otherwise, for thinking that such a misrepresentation was material to the government's funding decision.

It is also clear that, even if one was to set aside or excuse Relator's failure to allege materiality, the amended complaint lacks the specificity Rule 9(b) requires. In the fraudulent inducement context, a relator must "set out in detail the time, place, and content of the false representations and identif[y] individuals allegedly involved in the fraud[.]" *Toyobo Co.*, 811 F. Supp. 2d at 47. But, here, the amended complaint states only that, "[f]rom as early as 2001," Defendants "submitted grant applications,

proposals, and reports which included this inaccurate background and also inflated Mr. Wu's qualifications." (Am. Compl. ¶ 29.) There are no other details narrowing down the type of submission, the payment sought, or the timing. Relator has therefore failed to state with particularity the circumstances surrounding the alleged fraudulent inducement.

### 3. Relator's False Certification Theory

Liability for an FCA violation arises under a false certification theory where (1) a party certifies that he or she will comply with a particular contractual condition, (2) that party then fails to comply with that condition, (3) the party misrepresents this noncompliance, and (4) compliance with the condition is "material to the government's decision to pay." *Sci. Applications Int'l Corp.*, 626 F.3d at 1269-71. Relator's false certification theory centers on Defendants' lobbying activities and the fact that Defendants supposedly certified that grant funds would not be spent on those activities. (Am. Compl. ¶¶ 22, 44-45.) Allegedly, Defendants not only failed to comply with this condition, they misrepresented their noncompliance to the government. (*Id.*) However, this Court concludes that Relator's false certification theory satisfies neither Rule 9(b) nor Rule 12(b)(6) because the amended complaint does not specify the contents of the certification or the circumstances in which the certification was made, and it fails to allege adequately that a violation of the certification was material to the government's grant funding award.

It is well established that Rule 9(b) requires a relator to plead "the who, what, when, where, and how with respect to the circumstances of" a fraudulent certification. *Tran*, 2014 WL 2989948, at *11. Here, with respect to the fact of certification, Relator

merely offers the vague allegation that "the Grant recipients had to certify that no NED funds would be used for lobbying or had been used for lobbying[,]" which purportedly "included certifying the funds could not be used to influence or attempting [sic] to influence any federal employee or members of Congress or their staff." (*Id.* ¶ 44.) Relator does not provide any details as to the specific contents of the certification, the timing of the certification, how many times this certification was made over the course of his employment or, indeed, who made the certification on Defendants' behalf. In other words, although Relator provides numerous examples of allegedly barred lobbying activity (*see id.* ¶¶ 52-70); points to a statute that sets forth limitations on use of grant funding (*see id.* ¶ 44 (citing 31 U.S.C. § 1352)); and vaguely references— without any explanation—"Grant Provision 15(f)" (*id.* ¶ 64), the details of any certification, whether prohibiting lobbying or requiring compliance with the statutory conditions of grant funding, are entirely absent. Even apart from the materiality element, then, Relator's claim is deficient.

But materiality cannot be set aside as far as FCA fraud claims are concerned. See *Sci. Applications Int'l Corp.*, 626 F.3d at 1271 (holding that materiality is a central element in proving false certification, and that its presence must be "rigorously" enforced). Thus, even if Relator's conclusory allegations regarding the certification were sufficient to survive a Rule 9(b) motion, the amended complaint would still fail to satisfy Rule 12(b)(6). Relator's amended complaint contains no allegation regarding the actual materiality of any certification; rather, states only that, if any lobbying occurred, "the grantee" was required to complete a disclosure form, and apparently in that context, the grantee had to "note[] that the lobbying certification was 'a material

representation of fact upon which reliance was placed when this transaction was made or entered into[.]'" (Am. Compl. ¶¶ 22, 44.) Even ignoring the fact that the Court is left to speculate about the source of this purported quotation,[8] Relator's attempts to assert materiality are entirely conclusory—unmoored from any factual allegations—and thus miss the mark of a satisfactory statement of a false certification count for the purpose of Rule 12(b)(6). *See ASA Accugrade, Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 215 (D.D.C. 2005) ("To survive a motion to dismiss, the plaintiff must make factual allegations that are neither vague nor conclusory and that cover all the elements that comprise the theory for relief." (internal quotation marks and citation omitted)).

In sum, this Court concludes that neither the presentment count (Count I) nor the false statement count (Count II) can survive Defendants' motion to dismiss for failure to comply with the requirements of Rule 9(b) and/or 12(b)(6).

## B. Relator's Reverse FCA Action (Count III) Is Inadequately Pled Even Under The Post-FERA Legal Standard

In the third count of the amended complaint, Relator asserts that Defendants' conduct violates the provision of the FCA that prescribes the making of reverse false claims. As noted, section 3729(a)(1)(G) currently prohibits the making of false claims or statements for the purpose of avoiding an "obligation" to pay the government, and Congress intended the relevant triggering "obligation" to be defined broadly in the post-

---

[8] The quote could have come from an exhibit to Relator's original complaint titled "Grant Provision 18." (*See* Grant Provision 18, Exh. 3 to Compl., ECF No. 2-4; *compare* Compl. ¶ 25 *with* Am. Compl. ¶ 44.) Alternatively, the language may come from Standard Form LLL: Disclosure of Lobbying Activities, which is referenced in the amended complaint. (*See* Am. Compl. ¶ 44.) This form contains a disclaimer noting that "disclosure of lobbying activities is a material representation of fact upon which reliance was placed by the tier above when this transaction was made or entered into." Standard Form LLL: Disclosure of Lobbying Activities, available at http://www.whitehouse.gov/sites/default/files/omb/grants/sflllin.pdf. However, by Relator's own account, Defendants never filed this form. (Am. Compl. ¶¶ 22, 44.)

FERA version of the statute, in contrast to the narrow interpretation of that term some courts adopted before the FERA amendments. With respect to the reverse false statement count in this case, the parties vigorously dispute which definition of "obligation" should apply in this context.

Defendants maintain that the alleged conduct underlying Relator's reverse false claim action occurred prior to the passage of the FERA amendments and the current, broad definition of "obligation" is therefore inapplicable. (Defs.' Mem. at 24-25.) Further, Defendants take the position that, prior to FERA, an "obligation" only meant "an existing, concrete obligation to pay, whether through contract, regulation, or judgment." (*Id.* at 25.) Defendants argue that Relator would be unable to prevail under this definition, because he has not pointed to any specific contractual or statutory duty to pay that existed at the time of the purported misrepresentations. (*Id.* at 25-26.) For his part, Relator's consistent citation to section 3729(a)(1)(G) (the new provision)—as opposed to section 3729(a)(7) (the old provision)—suggests that he believes the broader post-FERA provisions apply. (*See, e.g.*, Am. Compl. ¶¶ 127, 138). Relator's opposition brief suggests that Defendants had a duty to repay certain funds that were spent improperly, such as the funds spent on lobbying (Relator's Opp'n at 27), and that such an "obligation" could trigger a reverse FCA action under the existing post-FERA definition of that term. *See* 29 U.S.C. § 3729(b)(3) (defining "obligation" such that it includes "the retention of any overpayment"); *see also United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012) (holding that "[a]n express contractual obligation to remit excess government property is a definite and clear obligation for FCA purposes").

Notably, the parties' dispute over the appropriate scope of the relevant "obligation" was apparently so intriguing that the U.S. government waded into this matter to present its position on the issue, even though it had declined to intervene with respect to the prosecution of this FCA case. (*See* U.S.'s Stmt. of Interest Concerning Defs.' Renewed Mot. to Dismiss Qui Tam Compl., ECF No. 56, at 3-13.) The government's "statement of interest" speaks only to the law, and it argues that the pre-FERA "obligation" definition in section 3729(a)(7) reaches situations where there is either merely a *potential* obligation or there is a general "duty to pay money or to transmit property to the Government[,]" even if the particular amount owed is not fixed. (*Id.* at 6.)

Although the government apparently could not resist the temptation to weigh in on the parties' "obligation" dispute, this Court finds that there is no reason for the Court to do so under the present circumstances because Relator's amended complaint clearly fails to satisfy the requirements of Rules 9(b) and 12(b)(6) even if the complaint and the applicable law are construed in the light most favorable to Relator. *See Brooks v. Grundmann*, 748 F.3d 1273, 1278 (D.C. Cir. 2014) ("While [plaintiff] urges us to pass upon the merits of her . . . claim, the inartful and inadequate state of [plaintiff's] pleadings prevents us from doing so."). To be specific, Relator attempts to use the language of a reverse FCA claim when he alleges that Defendants were "obligated to not use and/or disgorge grant funds improperly paid to them[.]" (Am. Compl. ¶ 163.) However, based on what little else the amended complaint says about the circumstances surrounding the alleged grant funding, Relator has failed to plead with sufficient specificity the particular monetary obligation that Defendants owed to the government

in a manner that would support a finding of *any* type of actionable obligation in this case.

Indeed, only three paragraphs in the entire amended complaint reference anything that could be construed as an obligation to the government.  Two of those paragraphs appear under the recitation of Count III and are simply conclusory statements disconnected from the rest of the complaint.  (*See id.* ("Defendants were obligated to not use and/or disgorge grant funds improperly paid to them by virtue of the fact that they were either prohibited or unallowable costs."); *id.* ¶ 164. ("Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government[.]").)  It is well established that "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context."  *Iqbal*, 556 U.S. at 686.

The third relevant paragraph states in part that Defendants' misrepresentation of their lobbying activities was "made with the intent to avoid any sort of repayment of federal funds already spent" (Am. Compl. ¶ 71), which is apparently an attempt to assert that Defendants' improper use of government funds triggered some sort of repayment obligation, and that, by lying about this improper use, Defendants concealed this obligation in violation of section 3729(a)(1)(G).  (Relator's Opp'n at 28-29.)  But that assertion is not supported by any specific allegations of fact—all the amended complaint has to say about any duty to repay is contained in that one paragraph noted above—and there is certainly nothing in Relator's amended pleading that comes anywhere close to establishing the source of any such obligation.  *See United States ex*

*rel. Tamanaha v. Furukawa Am., Inc.*, 445 F. App'x 992, 994 (9th Cir. 2011) (holding that relator must "allege the specific sources of [the defendant's] preexisting obligation" in order to satisfy Rules 12(b)(6) and 9(b)).  In addition to failing to provide any details about the source of the alleged obligation, Relator also fails to specify the *parameters* of that obligation, such as what triggers the duty to repay and what sort of repayment it requires.  Because the amended complaint provides none of this information, it is plainly insufficient under Rule 9(b).  *See United States ex rel. Dennis v. Health Mgmt. Associates, Inc.*, No. 3:09-CV-00484, 2013 WL 146048, at *11 (M.D. Tenn. Jan. 14, 2013) (holding that the relator fails to satisfy Rule 9(b) because he "fail[ed] to provide any specific factual allegations about what fraudulent record or statement the defendants made that caused them to avoid or decrease an obligation to pay the government . . . or its contents"); *see also Matheny*, 671 F.3d at 1223 (finding that the relator's complaint satisfied Rule 9(b) because it "contains detailed allegations relating to the Defendants' contractual obligation to identify, report, and remit excess government money in accordance with the" government contract).[9]

In his opposition to the present motion, Relator attempts to argue that an obligation arose out of Defendants' concealment of their allegedly fraudulent activity.  (Relator's Opp'n at 27-29.)  Under this telling, the concealment (which is alleged in the complaint) prevented the government from uncovering fraud and requiring repayment of

---

[9] Relator's lack of specificity regarding the instant Defendants' alleged duty to pay—*i.e.*, the lack of a clear answer to the question of what, exactly, was the obligation owed?—highlights the irrelevance of this Court's efforts to determine which definition of "obligation" applies in the context of this case.  Although the government's brief insists that the Court should adopt the broadest definition of "obligation" as the legal standard even when a complaint's allegations relate to conduct that occurred prior to FERA, breadth does not help Relator in *this* case, where the complaint has not specified *any* clear payment duty on the part of Defendants.  Put another way, in the absence of a specific allegation regarding exactly what payment (or repayment) Defendants owed to the government, this Court has no need to decide which universe of obligations a complaint concerning pre-FERA conduct implicates.

the grant funds that the government had provided. (*Id.*) But by this logic, just about *any* traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement actionable under sections 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money. *See United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338 (S.D.N.Y. 2004) ("Close examination of these claims leads to the inescapable conclusion that they are redundant—two ways of describing the same transaction. Because [Relator's] allegations state a claim under sections 3729(a)(1) and (2), they cannot also form the basis for a claim under subsection (a)(7)."). And of course, if the conduct that gives rise to a traditional presentment or false statement action also satisfies the demands of section 3729(a)(1)(G), then there would be nothing "reverse" about an action brought under that latter section of the FCA.

Finally, it is also apparent that Relator cannot now claim that there is a general obligation to repay all instances of misuse of grant funds when the amended complaint does not state as much. Nor can Relator satisfy Rule 12(b)(6) by pointing to examples of other potential repayment obligations that simply do not appear anywhere in the amended complaint. In his opposition brief, for example, Relator references a consent decree (Relator's Opp'n at 27); an "express repayment duty" (*id.*); and a "reconciliation" of claims (*id.* at 28). [10] Even if this Court were to believe that a duty to pay the government arose out of any of the sources Relator belatedly highlights, it is

---

[10] There is often a startling disconnect between what Relator *argues* his amended complaint says and what the amended complaint *actually* says. In addition to the examples discussed here, Relator's briefs also invoke the federal government's right to disgorge profits (Relator's Opp'n at 27-29) and Defendants' "contractual obligation to pay any unused portions of grant money back[.]" (Relator's Resp. to U.S.'s Stmt. of Interest, ECF No. 58, at 5). Neither of these duties is present in the amended complaint. Other examples abound and are typical of the way in which Relator consistently attempts to bolster his arguments with allegations that should have been made in the amended complaint.

well established that, "[i]n deciding a motion brought under Rule 12(b)(6), a court does not consider matters outside the pleadings[.]" *Ward v. Dist. of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011). For these reasons, Relator cannot prevail on his action under section 3729(a)(1)(G).

### C. Relator's Conspiracy Action (Count IV) Must Be Dismissed Under Rule 12(b)(6)

In the fourth count of the amended complaint, Relator alleges that Wu and the Corporate Defendants conspired to violate the FCA. (*See* Am. Compl. ¶¶ 166-180.) This count can be disposed of in short order for one simple reason: there can be no conspiracy to commit fraud in violation of the FCA if an underlying false claim has not been adequately alleged. *See Halberstam*, 705 F.2d at 477 (noting that "civil conspiracy depends on performance of some underlying tortious act" and is not actionable apart from an underlying tort); *Amin*, 26 F. Supp. 2d at 165 (dismissing a conspiracy action because, among other reasons, defendants were not liable for any underlying violation of the FCA). As explained, Relator's actions under sections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(G) fail, either because the facts in the amended complaint are insufficient to state a fraud claim as Rule 12(b)(6) requires or because the amended complaint fails to provide sufficient specificity to satisfy Rule 9(b)'s heightened pleading requirement; consequently, Relator's action under section 3729(a)(1)(C) also must fail.

This Court need not proceed to address any other problems with Relator's conspiracy allegation, but it is worth mentioning that there are additional patently obvious flaws with this count. For example, while Relator appears to maintain that Wu, LRF, and CIC conspired to present false claims and false statements to the government,

under the intra-corporate conspiracy doctrine, one entity "cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves." *Head*, 798 F. Supp. 2d at 201 (internal quotation marks and citation omitted). Thus, Wu cannot be said to have conspired with either LRF or CIC as a matter of law. *See id.* Furthermore, to the extent that two corporate entities can conspire with each other, *see Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 267 (D.D.C. 2006), the complaint makes clear that *Wu* was the driving force behind the alleged illegality, and it is devoid of any facts from which this Court could infer that CIC and LRF each separately agreed to join any conspiracy to defraud the government. What is more, the amended complaint also specifically alleges that CIC was a "wholly-controlled affiliate" of LRF (Am. Compl. ¶ 10), and it is well established that one corporation and a wholly-owned subsidiary cannot conspire with each other. *See Corsi v. Eagle Publ'g, Inc.*, No. 07-cv-2004, 2008 WL 239581, at *3 n.2 (D.D.C. Jan. 30, 2008) (citing *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000) & *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990)); *see also Rawlings v. Dist. of Columbia*, 820 F. Supp. 2d 92, 103 (D.D.C. 2011) (noting that "there is no conspiracy if the conspiratorial conduct challenged is *essentially* a single act by a single corporation" (emphasis added) (internal quotation marks and citation omitted)). Accordingly, Count III fails as a matter of law for a variety of reasons, and thus must be dismissed.

### D. Relator's Retaliation Action (Count V) Is Pled Adequately And Survives The Instant Motion To Dismiss

The amended complaint's final count alleges that Defendants' termination of Relator's employment violated the FCA's anti-retaliation provision. (Am. Compl. ¶¶

181-186.) As a threshold matter, unlike the FCA fraud allegations in Counts I through IV, allegations regarding retaliation in violation of the FCA "are 'unconstrained by the fraud pleading standard' and 'need satisfy only Rule 8's general pleading requirements.'" *Sharma v. Dist. of Columbia*, 881 F. Supp. 2d 138, 142 n.3 (D.D.C. 2012) (quoting *Martin-Baker*, 389 F.3d at 1259). Moreover, an action brought under the FCA's retaliation provision can survive even where the underlying FCA fraud counts have been dismissed. *See, e.g.*, *Martin-Baker*, 389 F.3d at 1254 (affirming dismissal of the relator's underlying FCA presentment action under Rule 9(b) but reversing the district court's 12(b)(6) dismissal of the relator's whistleblower retaliation count). As explained below, such is the case here.

      1.  The Complaint Contains Sufficient Allegations Of "Protected Activity"

According to the amended complaint, Relator "brought to Defendants' attention what he reasonably believed to be improper and fraudulent acts" (Relator's Opp'n at 38); specifically, he repeatedly complained to Wu about improper billing practices and misuse of funds, and eventually informed a board member about the purportedly unlawful conduct, suggesting that the board take action to stop it (Am. Compl. ¶¶ 113-18). The pre-FERA retaliation provision of the FCA specifically listed "lawful acts" for which an employee was entitled to protection, and this list "include[d] investigation for, initiation of, testimony for, or assistance in an action to be filed" under the FCA. 31 U.S.C. § 3730(h) (2008). Explaining the meaning of "investigation" under this statute, the D.C. Circuit has noted that the statute is meant to "protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together"; therefore, "it is sufficient that a [relator] be investigating

matters that 'reasonably could lead' to a viable False Claims Act case[.]" *Yesudian*, 153 F.3d at 740 (citation omitted). In other words, a plaintiff need not "have developed a winning qui tam action" to be retaliated against in violation of the FCA. *Id.* at 739 (citing S. Rep. No. 99-345, at 35).

Of course, not all of a relator's investigative efforts can necessarily support an actionable retaliation count: the investigation "must concern 'false or fraudulent' claims[,]" rather than mere "non-compliance with federal or state regulations." *Id.* at 740 (citations omitted); *cf. Hoyte*, 518 F.3d at 68-70 (affirming dismissal of the relator's FCA retaliation action where the complaint only referenced the defendants' "mere regulatory noncompliance"—*i.e.*, failure to follow procedures set forth in a consent decree); *see also McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 517 (noting that the relator's reports of wrongdoing must be directed towards an investigation into fraud on the government in order to qualify as "protected activity" under the FCA). Be that as it may, "several courts have said that internal reporting of false claims is itself an example of a protected activity" that can give rise to an FCA retaliation action. *Yesudian*, 153 F.3d at 741 n.9 (collecting cases); *see also Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186-87 (3d Cir. 2001) (noting that internal reporting may constitute a protected activity). Ultimately, the determination of "what activities constitute 'protected activity' is a fact specific inquiry[,]" *Hutchins*, 253 F.3d at 187, and as the D.C. Circuit has noted, "protected activity" was meant to be interpreted broadly. *Yesudian*, 153 F.3d at 741.

For example, in *United States ex rel. Yesudian v. Howard University*, 153 F.3d at 745, the D.C. Circuit considered whether relator's internal reports and investigation

were a sufficient basis to establish that relator had engaged in protected activity for the purpose of his FCA retaliation action. In that case, the relator worked in the Purchasing Department at Howard University, which received federal funding and had contracts with the General Services Administration. *Id.* at 734-35. The relator contended that his supervisor retaliated against him after he repeatedly reported to his supervisor's superiors that the supervisor had engaged in a number of financial improprieties related to the University's receipt of federal funding from the General Services Administration. *Id.* At those superiors' requests, the relator collected evidence from other employees to substantiate his reports, *id.*; the supervisor terminated the relator's employment shortly after learning of the relator's efforts, *id.* at 735. The D.C. Circuit affirmed the district court's entry of summary judgment in defendant's favor on all of the underlying false claims counts, but it found that the relator had alleged and established sufficient facts for a reasonable jury to find a violation of the FCA's retaliation provision because the relator was "investigating matters that reasonably could lead to a viable [FCA] case." *Id.* at 740 (internal quotation marks omitted).

Here, too, the retaliation count survives even as the underlying FCA fraud counts do not. Unencumbered by the specificity requirement in this context, the amended complaint can easily be read to allege that Relator engaged in some level of investigation to determine the scope and frequency of the suspected fraud, given the allegation that Relator "sought to ascertain other facts to determine how far in scope and how often these irregularities were occurring." (Am. Compl. ¶ 24.) What is more, the complaint alleges that Relator brought the information that he had learned during the course of this investigation to Wu's attention. Although some of Relator's reported

conversations appear to reflect Wu's own statements about Corporate Defendants' internal reimbursement practices and therefore do not relate directly to defrauding the government (*see, e.g.*, *id.* ¶ 115 (noting that Wu told Relator that he could debit Corporate Defendants' accounts to compensate Relator for personal expenses); *id.* ¶ 117 (noting Chen's practice of staying home from work while still getting paid)), Relator does allege that he was investigating suspected fraudulent acts related to grant funding and other activities, and the amended complaint contains facts that, if true, put Wu on notice of the possibility that Relator's investigations may reasonably have led to an FCA action. In particular, Relator alleges that, in 2005, he met with Wu to discuss "the billing of the DOS/NED Program for monies that Corporate Defendants were not entitled to receive[.]" (*Id.* ¶ 113.) Relator also alleges that, in 2007, he warned that Wu should "not use federal money to sponsor a lawsuit against Yahoo!" specifically because "federal monies were only to be spent on DOS/NED program-related expenses." (*Id.* ¶ 116.) Relator further alleges that he raised certain improper spending concerns with board member Martin and discussed "possible actions, internal and external, that could be taken to correct" the conduct. (*Id.* ¶ 118.) Drawing all inferences in Relator's favor and following the D.C. Circuit's instruction that "protected activity" should be interpreted broadly, *see Yesudian*, 153 F.3d at 740, these allegations create a plausible inference that Relator was engaged in activities "that reasonably could lead to a viable False Claims Act case." *Id.* (internal quotation marks omitted).

Defendants' argument that Relator's investigation into, and reports of, fraud do not give rise to an actionable RCA retaliation action because they were part of his

ordinary job responsibilities (*see* Defs' Mem. at 28 (contending that the complaint "does not raise the inference that Si did anything but perform his job functions and report to a supervisor")) is unavailing. It is true that "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice" of any protected activity. *Martin-Baker*, 389 F.3d at 1261 (internal quotation marks and citation omitted); *see also Schweizer*, 677 F.3d at 1239 (noting that the relator's retaliation action could not succeed because her "job was to ensure compliance with government contracts"). But the amended complaint belies Defendants' argument that this so-called "*Martin-Baker* presumption" applies here. Relator has alleged that he worked for Corporate Defendants as a "computer technician" and later became either "Assistant Director" or "Computer/office manager." (Am. Compl. ¶ 7.) The amended complaint specifically notes that Relator was never "responsible for Defendants' compliance" but merely had access to "some billing and accounting information." (*Id.*) Taking these allegations of fact as true, Relator's alleged investigation into Corporate Defendants' billing practices, and also his suggestion to Martin that they take possible external actions to stop further wrongdoing, was outside the scope of Relator's job responsibilities, and thus satisfies the "protected activity" element of an FCA retaliation action.

### 2. The Complaint Contains Sufficient Facts From Which To Infer The Requisite Causal Connection

The allegations in the amended complaint also state a plausible claim that Wu was terminated *because of* his protected activity. The "causation" element of a retaliation action requires a relator to show both that "(a) 'the employer had knowledge

the employee was engaged in protected activity'; and (b) 'the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity.'" *Yesudian*, 153 F.3d at 736 (alteration in original) (quoting S. Rep. No. 99-345, at 35); *Sharma v. Dist. of Columbia*, 791 F. Supp. 2d 207, 218 (D.D.C. 2011) (same); *see also Saunders v. Dist. of Columbia*, 958 F. Supp. 2d 222, 228 (D.D.C. 2013) (noting that the relator need only show that protected FCA activity was a "'contributing factor'" in the employment action (quoting *Payne v. Dist. of Columbia*, 722 F.3d 345, 353 (D.C. Cir. 2013)). The D.C. Circuit has called the standard for notice "flexible: 'the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged[,]'" *Martin-Baker*, 389 F.3d at 1260 (quoting *Yesudian*, 153 F.3d at 742), except that "'the employer [has to be] aware that the employee is investigating fraud'"; otherwise, "'the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)[,]'" *id.* at 1260-61 (quoting *Yesudian*, 153 F.3d at 744). Moreover, with respect to causation, courts have noted that the standard a relator must meet to survive a motion to dismiss is "not onerous; the [relator] merely has to [show] that the protected activity and the negative employment action are not completely unrelated." *United States ex rel. George v. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 609 (S.D. Tex. 2012) (internal quotation marks and citation omitted).

The amended complaint here alleges that Relator expressed his concerns about Corporate Defendants' billing practice as it related to the receipt of DOS/NED grant funding directly to Wu, and also that Relator had suggested to a board member that they take "possible actions" to stop the alleged fraud. (*Id.* ¶ 118.) These allegations are

plainly sufficient at this stage of the litigation to support a plausible contention that Defendants were on notice of Relator's protected activity.

Relator also has alleged sufficient facts to support an inference that his engagement in protected activity was what motivated Defendants to terminate his employment. In assessing the causal link between protected activity and a relator's termination, courts often consider the temporal proximity between the employer's notice of the conduct and the relator's termination. *See, e.g.*, *Schweizer*, 677 F.3d at 1240 (finding a causal connection where relator was fired two weeks after disclosing his fraud suspicions to defendants); *Martin-Baker*, 389 F.3d at 1262 (holding that, because "his suspension and termination occurred *just after* he disclosed" the allegedly fraudulent conduct "to his superior, [the relator] has satisfactorily alleged" causation (emphasis added)); *Pitts v. Howard Univ.*, No. 13-1398, 2014 WL 69032, at *1, *4 (D.D.C. Jan. 9, 2014) (finding a sufficiently alleged causal connection where plaintiff was demoted one year after raising concerns about his employer's tax practices); *see also Strong v. Univ. Healthcare Syst., LLC*, 482 F.3d 802, 808 (5th Cir. 2007) (noting that, while temporal proximity alone may not be enough to prove causation, it can be sufficient to establish a prima facie case). Applying this factor to the case at bar, the amended complaint's allegation that Wu terminated Relator within months of learning that Relator had reported fraudulent billing practices to a board member (*see* Am. Compl. ¶¶ 118-120) is sufficient to give rise to an inference of causation, *see Schweizer*, 677 F.3d at 1240; *Martin-Baker*, 389 F.3d at 1262; *Pitts*, 2014 WL 69032, at *3.

Defendants attempt to avoid this conclusion by focusing on the three-year gap between when Relator *first* reported possible fraud (in 2005) and when he was eventually terminated (in 2008). (*See* Defs.' Mem. at 31 ("It is implausible that Defendants waited, not three weeks, but three years to terminate Si in supposed 'retaliation' for reporting his concerns.").) But the allegations in the amended complaint involve not an isolated misconduct report but repeated attempts on Relator's part to address the situation in a manner that reflects a pattern of escalating concern: after Relator's repeated discussions of fraud that were voiced directly to Wu fell on deaf ears, Relator finally went above Wu's head and raised his concerns about Defendants' misuse of grant funds with a member of the board of directors. (Am. Compl. ¶ 118.) And it was only three months after *that* event—which included Relator's articulated threat of possibly taking external action—that Defendants terminated Wu's employment. Given these facts, it is entirely plausible to infer that Defendants decided to terminate Relator when Relator took his concerns to the board and threatened to act on them.

### 3. Relator Can Maintain This Action Against Wu In His Individual Capacity

Finally, despite Defendants' protest, this Court finds that the complaint contains enough allegations of fact regarding the relationship between Defendant Wu and the Corporate Defendants that, at least for now, the retaliation count in the amended complaint can be maintained not only against LRF and CIC but also against Defendant Wu in his individual capacity. Unlike other provisions of the FCA, which impose liability on "any *person*" who violates the statute, *see, e.g.*, 31 U.S.C. § 3729(a)(1), (3) (emphasis added), pre-FERA section 3730(h) only imposes liability on an "employer."

Although "the word 'employer' does not *normally* apply to a supervisor in his individual capacity[,]" *Yesudian ex rel. United States v. Howard Univ.*, 270 F.3d 969, 972 (D.C. Cir. 2001) (emphasis added), there is an exception to this rule: as the district court explained in *United States ex rel. Siewick v. Jamieson Science and Engineering, Inc.*, 191 F. Supp. 2d 17, 20-21 (D.D.C. 2002), an individual supervisor *can* be held liable as an employer under section 3730(h) when the supervisor "can be considered to be an alter ego of the company, and therefore an 'employer'" based on the familiar principle of piercing the corporate veil. [11]

In this circuit, a two-pronged test is used to determine whether to pierce the corporate veil: "(1) is there such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?" *Siewick*, 191 F. Supp. 2d. at 21 (quoting *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982)). With respect to this test, courts consider such factors as "domination of the organization by a single individual" and failure to maintain corporate formalities, including "diversion of the corporation's funds or assets to non-corporate uses such as personal use by the . . . dominant, controlling person." *United States v. Emor*, 850 F. Supp. 2d 176, 207 (D.D.C. 2012). And not all factors need to be present to justify piercing; rather, the court's analysis "depends more on the facts than on any sharply defined underlying legal standard[.]" *United States v. Pena*, 731 F.2d 8, 13 (D.C. Cir. 1984).

---

[11] Courts can pierce the corporate veil of non-profit corporations just the same as their for-profit counterparts. *See United States v. Emor*, 850 F. Supp. 2d 176, 206 (D.D.C. 2012).

Relator's amended complaint alleges in no uncertain terms that Relator was an employee of LRF and CIC, and that Wu was working "on behalf of Corporate Defendants" when he terminated Relator. (Am. Compl. ¶ 183; see also ¶ 4.)[12] The complaint also includes ample allegations of fact that raise a plausible inference that Wu and the Corporate Defendants shared a common identity such that piercing the corporate veil may be appropriate. For example, Relator explicitly alleges that Wu had "de facto control" over both organizations. (Am. Compl. ¶ 12). The amended complaint thus alleges that Wu is the dominant, controlling force behind both Corporate Defendants, which weighs in favor of piercing the corporate veil. *See Emor*, 850 F. Supp. 2d at 207. Furthermore, the amended complaint repeatedly alleges that Wu regularly used corporate funds for personal expenses (*see, e.g.*, *id.* ¶¶ 82, 95), which, if true, provides further justification for piercing the corporate veil, *see Emor*, 850 F. Supp. 2d at 207 (citation omitted).

It may well turn out that, after the record is fully developed during discovery, the facts of Wu's relationship with the Corporate Defendants is other than Relator represents and thus that veil-piercing is not appropriate. For example, further information on the control exercised by the board of directors of LRF and CIC will likely play an important role in deciding the extent to which Wu dominates those organizations. But at this stage of the litigation, Relator has alleged sufficient facts to raise a plausible inference that Wu is the alter ego of LRF and CIC, and thus this Court

---

[12] While Relator argues in his opposition that he "allege[s] that he was jointly employed by Defendants CIC, LRF, and Wu" (Relator's Opp'n at 35), this allegation appears nowhere in the amended complaint; rather, it is set forth in a state-court complaint attached as an exhibit to Defendants' motion to dismiss the original complaint in this action. (*See* State Court Compl., Ex. A to Defs.' Mem., ECF No. 30-1.)

rejects without prejudice Defendants' argument that Relator cannot maintain his FCA retaliation action against Defendant Wu in his individual capacity.

## IV.    CONCLUSION

For the reasons explained above, Relator has not satisfied the pleading standards of Rule 9(b) regarding his actions against Defendants for the presentation of false claims, the making of material false statements, concealment to reduce repayment obligations, or conspiracy to violate the FCA (Counts I–IV), so those counts must be dismissed. With respect to Relator's retaliation action (Count V), the pleading standards have been satisfied, and Relator has also provided sufficient factual allegations to support an action against Wu in his individual capacity. It may well be that, once discovery proceeds in this case, Relator will be unable to establish that there is a factual basis for his retaliation action, perhaps because Relator did not actually raise concerns about false *claims*, or because Wu did not, in fact, learn of Relator's report of fraud and suggestion of taking outside action to a board member, or otherwise. But based on the facts alleged in the amended complaint, Relator has stated a plausible retaliation action, even as he fails to state sufficiently any claim that fraud occurred in violation of the FCA. Consequently, this Court has issued an order that **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss. (*See* Sept. 30 Order.)


DATE:  October 14, 2014                     *Ketanji Brown Jackson*
                                            KETANJI BROWN JACKSON
                                            United States District Judge

51